SPRINGFIELD-SANGAMON COUNTY REGIONAL PLAN COMMISSION, Plaintiff-Appellee, *v.* FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellants.—(THE CITY OF SPRINGFIELD *et al.*, Defendants.)— THE CITY OF SPRINGFIELD, Plaintiff-Appellee, *v.* FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellants.—(SPRINGFIELD-SANGAMON COUNTY REGIONAL PLAN COMMISSION *et al.*, Defendants.)—THE COUNTY OF SANGAMON, Plaintiff-Appellee, *v.* FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellants.— (THE CITY OF SPRINGFIELD *et al.*, Defendants.)

Fourth District   No. 12786

Opinion filed December 4, 1976.

William J. Scott, Attorney General, of Chicago (Jerrald B. Abrams, Assistant Attorney General, of counsel), for appellant Fair Employment Practices Commission.

Robert Weiner, of Springfield, for appellant Elwood Smith.

C. Joseph Cavanagh, State's Attorney, of Springfield (Wayne Golomb, Assistant State's Attorney, and Gary Lee Fields, law student, of counsel), for appellee City of Springfield.

John R. Chapin, of Chapin and Chapin, W. J. Simhauser, and D. Bradley Blodgett, Corporation Counsel, all of Springfield, for appellees.

Mr. JUSTICE GREEN delivered the opinion of the court:

On March 29, 1973, defendant, the Illinois Fair Employment Practices Commission (F.E.P.C.) entered an order and decision finding plaintiffs, Springfield-Sangamon County Regional Plan Commission, County of Sangamon and City of Springfield, to have committed an unfair employment practice in not hiring defendant Elwood Smith as "Urban Renewal Planner-Administrator" because of his race. Plaintiffs were ordered to offer Smith the job, to pay him certain sums that he would have received had he been hired at a time another was chosen for the job, and to take several other steps to prevent future discrimination based on race.

Plaintiffs appealed this decision and order to the Circuit Court of Sangamon County pursuant to the provisions of the Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*) by separate complaints which were consolidated in the circuit court. After a hearing, that court ruled that F.E.P.C. had lost jurisdiction of the case prior to the time of its decision and order and reversed and set aside the F.E.P.C. ruling. Defendants appeal to this court.

The Administrative Review Act provides that a complaint for review shall be filed in the circuit court within 35 days from the date that a copy of the administrative decision is served on the plaintiff (Ill. Rev. Stat. 1973, ch. 110, par. 267) and that the administrative agency and all persons other than the plaintiff who were parties in the administrative proceedings shall be made defendants (Ill. Rev. Stat. 1973, ch. 110, par. 271). None of the plaintiffs made the other plaintiffs defendants to their respective complaints for review. After the 35-day period had elapsed, defendant Smith made motions to dismiss the complaints on the grounds that the circuit court lacked jurisdiction because of the failure to join all proper parties. That court, however, allowed subsequently made motions to join the necessary parties and denied Smith's motion to dismiss.

In *Hailey v. County Board of School Trustees* (1959), 21 Ill. App. 2d 105, 157 N.E.2d 570, and *Dendor v. Board of Fire & Police Commissioners* (1973), 11 Ill. App. 3d 582, 297 N.E.2d 316, subsequent amendments to add necessary parties, although made after the end of the 35-day period for filing the complaint, were held to have cured the defect. In *O'Hare International Bank v. Zoning Board of Appeals* (1972), 8 Ill. App. 3d 764, 291 N.E.2d 349, and *Winston v. Zoning Board of Appeals* (1950), 407 Ill. 588, 95 N.E.2d 864, cited by defendant Smith, no such amendments were made. The circuit court had jurisdiction and the denial of the motions to dismiss was correct.

Section 3 of the Illinois Fair Employment Practices Act (F.E.P.A.) at all times in point provided in part:

"It is unfair employment practice:

(a) For any employer, because of the race, color, religion, national origin or ancestry of an individual to refuse to hire, to segregate, or otherwise to discriminate against such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment; * * *."

(Ill. Rev. Stat. 1967, ch. 48, par. 853.)

Procedure under the Act is governed by section 8 (Ill. Rev. Stat. 1967, ch. 48, par. 858) and, in general, provides for the usual administrative remedies. After a proceeding has been instituted, a hearing is held before a hearing officer. If a determination is made based upon substantial evidence, this recommendation becomes the decision of the Commission if a petition for review is not filed. If such a petition is filed, further evidence may be presented to a commissioner and oral argument had before the whole Commission. The Commission may grant a trial de novo. Section 10 of the Act (Ill. Rev. Stat. 1973, ch. 48, par. 860) makes the decision of the Commission appealable under the Administrative Review Act.

Of special importance here is the procedure for initiating an action. Section 8 further provided, "Whenever within 120 days after the date that an unfair employment practice allegedly has been committed, a charge in writing under oath or affirmation is filed with the Commission by a complainant and in such detail as to substantially apprise any party properly concerned as to the time, place and facts with respect to such alleged unfair employment practice, that any employer, labor organization, employment agency, or person, hereinafter referred to as a respondent, has committed such unfair employment practice, the Commission shall promptly serve a copy of the charge or summary thereof on the respondent" and investigate to see if there is substantial evidence to support the charge. If not, the charge is to be dismissed. If substantial supporting evidence is found, the commission is to initiate a conciliatory procedure. If this fails, a complaint is to be filed.

Until October 1, 1972, the following provision was in force:

"Whenever a charge of an unfair employment practice has been properly filed, the Commission, within 180 days thereof, shall either issue and serve a complaint in the manner and form set forth in this Section or shall order that no complaint be issued. Any such order shall be duly served upon both the complainant and the respondent." (Ill. Rev. Stat. 1967, ch. 48, par. 858(c).)

After October 1, 1972, the Fair Employment Practices Act provided in part:

"Whenever such a charge of an unfair employment practice has been properly filed, the Commission, within 180 days thereof or within any extension of that 180 day period agreed to in writing by all parties and approved by a member of the Commission, shall either issue and serve a complaint in the manner and form set forth in this Section or shall order that no complaint be issued. Any such order shall be duly served upon both the complainant and the respondent." Ill. Rev. Stat. 1972 Supp., ch. 48, par. 858.01(a).

On June 12, 1968, defendant Elwood Smith filed a verified charge of unfair employment practice with the F.E.P.C. naming as respondents "City of Springfield Plan Commission, Nelson Howarth, Mayor, Eugene Estes, Chairman, Bradley Taylor, Executive Director." The unfair practice was alleged to have occurred on or about May 20, 1968. The charge further stated that in October 1967 Smith placed an application for a job with Taylor, was interviewed by him for about two hours and kept in touch with him until March 1968. Smith further alleged that in reading a newspaper article on May 20, 1968, "I learned I had been discriminated against because of my race [Negro] and color."

On September 9, 1968, an amended charge was filed by Smith substantially the same as the original except that it named as respondents "Springfield-Sangamon County Regional Plan Commission, Eugene Estes, Chairman, Bradley Taylor, Executive Director City of Springfield Plan Commission." Investigation was made and conciliation attempted. On December 5, 1968, a stipulation purporting to extend the 180-day period in which a complaint could be issued was entered into between defendant Smith and plaintiff Springfield-Sangamon County Regional Plan Commission and approved by the F.E.P.C. This agreement, plus a subsequent modification and a similar agreement, purported to extend the 180-day period to March 31, 1969.

Conciliation was attempted unsuccessfully until, on March 26, 1969, a complaint was filed naming plaintiff Springfield-Sangamon County Regional Plan Commission as respondent and alleging an unfair employment practice on or about May 20, 1968, as set forth in the charge filed on June 12, 1968, as per a copy attached. Attached was the original charge to which the respondent to the complaint was not a respondent. On April 30, 1969, pursuant to leave, the F.E.P.C. amended its complaint to add an allegation that unfair employment practices were committed on or about October 1967, May 20, 1968, January 26, 1969, February 14, 1969, and March 18, 1969. On August 22, 1969, a petition was presented to further amend the complaint to add plaintiffs City of Springfield and County of Sangamon as additional respondents. The petition was allowed on October 7, 1969, and an amended complaint was issued on April 28, 1970. This complaint named the city and county as additional parties and

alleged an unfair employment practice on or about May 20, 1968, as set forth in a charge filed on June 12, 1968, a copy of which was alleged to be attached. The document attached to the complaint was a copy of the charge filed on September 9, 1968, and with the words "County of Sangamon and City of Springfield or their agents" interlineated by the names of the original respondents to that charge.

All plaintiffs contend that the then existing requirement of section 8(c) of the Act that the complaint be filed within 180 days of the charge was jurisdictional and that because of the failure to timely file such a complaint, the administrative agency lost jurisdiction. It was for this reason that the circuit court reversed. Recently the Fifth District Appellate Court has held in *Moss-American, Inc. v. Illinois Fair Employment Practices Com.* (1974), 22 Ill. App. 3d 248, 317 N.E.2d 343, that the 180-day requirement is not mandatory and that the failure of the administrative agency to file the complaint until a few days after the deadline did not deprive the agency of jurisdiction. The court reasoned that to rule otherwise would deprive the claimant of a cause of action through the oversight of the agency in meeting the deadline.

■■ In *Equal Employment Opportunity Com. v. E.I. DuPont deNemours and Co.* (D. Del. 1974), 373 F.Supp. 1321, and *Equal Employment Opportunity Com. v. Cleveland Mills Co.* (4th Cir. 1974), 502 F.2d 153, a breach of similar provisions of Title VII of the 1964 Civil Rights Act (42 U.S.C. §2000e *et seq.*) were held to not deprive the administrative agency of jurisdiction. Conciliation when possible is an obvious goal of both the Fair Employment Practices Act and Title VII. We do not think that the Illinois legislature intended to hamper this process by making it impossible for parties to enter into agreements extending the period of conciliation. We think that the recent amendment authorizing such extensions was declaratory of the pre-existing law. As far as plaintiff, Springfield-Sangamon County Regional Plan Commission, is concerned, the 180-day requirement is not a bar.

Prior to July 1, 1968, section 2(c) of the Fair Employment Practices Act (Ill. Rev. Stat. 1967, ch. 48, par. 852(c)) provided that its terms were binding only on employers with 50 employees. Effective that date all governmental units of the state or a subdivision thereof, regardless of the number of their employees, were made subject to the Act. Plaintiff Springfield-Sangamon Regional County Plan Commission made a motion before the F.E.P.C. to dismiss, supported by affidavit that it employed only eight people. The motion was denied. The parties agree, however, that the organization calling itself Springfield-Sangamon County Regional Plan Commission employed only eight people. If that organization was a separate entity, the F.E.P.C. had no jurisdiction over it for a complaint alleging an unfair practice on or about May 20, 1968.

Since plaintiff Springfield-Sangamon County Regional Plan Commission was the only plaintiff to sign the agreement extending the 180-day conciliation period, even under the present statute the F.E.P.C. would have jurisdiction of plaintiffs City of Springfield and Sangamon County only if Springfield-Sangamon County Regional Plan Commission had power to bind them to the agreement. Determination of the status of Springfield-Sangamon County Regional Plan Commission is therefore crucial to our decision.

In 1957, the Sangamon County Regional Plan Commission was created by a resolution adopted by the Sangamon County Board of Supervisors pursuant to the power given them by "An Act to provide for regional planning and for the creation, organization and powers of regional planning commissions" (Ill. Rev. Stat. 1957, ch. 34, par. 152a *et seq.*). The resolution authorized the commission to appoint an executive director and employees as it deemed necessary. Ex officio voting membership was given to various county officials and those of municipalities in the county including the City of Springfield. Other members were to be appointed by the county board of supervisors.

Contemporaneously with the creation of the Sangamon County Regional Plan Commission, the governing board of the county passed three other resolutions. Each recited that the board had on that day created a "Regional Planning Commission" for the county. The resolutions created a fund to be known as the "Regional Planning Commission Fund" to be held by the treasurer. A transfer of $6000 of county moneys was made to the fund and the treasurer was authorized to apply to the City of Springfield and the Federal Government for other funds. The treasurer was authorized to make payment from the fund only on warrants issued and signed by the chairman and secretary of the Commission and countersigned by himself.

That same year, the Springfield Plan Commission was created by city ordinance under the power given the city by article 53 of the revised cities and villages act (Ill. Rev. Stat. 1957, ch. 24, par. 53—1 *et seq.*). Its membership was to consist of certain city officials and other persons appointed by the mayor with the approval of the city council. The ordinance expressly stated that the Commission might meet with the Sangamon County Regional Plan Commission under a single chairman "provided that only members of the Springfield Plan Commission will vote on city matters." "With the consent and approval of the mayor," it was given power to "appoint an executive director and such employees as it deems necessary" and "to contract for technical services with the Sangamon County Regional Plan Commission" and other groups. Its functions were pretty well limited to the area of the city.

Although the county resolutions made no mention of joint meetings

with the Springfield group or the selection of a joint chairman, the city and county plan commissions met jointly and selected a joint chairman and a joint secretary. They called the joint group the Springfield-Sangamon County Regional Plan Commission. A director was hired and office space was provided in the portion of the city-county complex rented by the city from the local building authority.

No legislative authority existed for the creation of such a plan commission as a separate entity. Neither did the city ordinances nor the county resolutions authorize the creation of such a plan commission. We hold that the Springfield-Sangamon County Regional Plan Commission was not a separate legal entity.

The method of operation was more nearly that of the Sangamon County Regional Plan Commission than that of the Springfield Plan Commission in that the mayor did not approve the hiring of employees and the moneys were handled through the fund set up for the county plan commission. No showing was made, however, that the services performed for the benefit of the city were pursuant to contract. Rather, the budget for the Springfield-Sangamon County Regional Plan Commission for the year 1969-1970 shows that a portion of the salary of the director and his assistant were allocated partly to the City of Springfield as was all of the salary for the "urban renewal administrator." Pursuant to this budget, a lump sum grant was obtained from the city. Based upon the evidence presented, we rule that the Springfield-Sangamon County Regional Plan Commission was actually a joint operation of the Sangamon County Regional Planning Commission and the Springfield Plan Commission.

■■■ Neither the enabling legislation nor the empowering ordinances and resolutions created either the city or the county plan commission as a separate entity from its parent municipality. In *Fiore v. City of Highland Park* (1968), 93 Ill. App. 2d 24, 235 N.E.2d 23, a city was held to have knowledge of a court decision by virtue of a statement of the decision contained in a report of its plan commission. The fact that a commission of a municipality is given independence in exercising its granted powers does not keep it from being a part of the municipality. (See McQuillin, Municipal Corporations §12.40 (3d ed. 1973); *People ex rel. Jacobs v. Coffin* (1918), 282 Ill. 599, 119 N.E. 54; *People ex rel. Malone v. Mueller* (1946), 328 Ill. App. 593, 66 N.E.2d 516.) Accordingly, by being a joint operation of the two plan commissions, Springfield-Sangamon County Regional Plan Commission was a joint operation of plaintiffs City of Springfield and Sangamon County.

■■ Since Springfield-Sangamon County Regional Plan Commission is not a legal entity, the trial court properly reversed the order against it. The other two plaintiffs were both employing units that at all pertinent

times had sufficient employees to bring them within the effect of the F.E.P.A. Both plaintiffs were duly notified of the charge filed on September 9, 1968. Since Springfield-Sangamon County Regional Plan Commission was an arm of both city and county, the act of the officers of that group in agreeing to extend the period of conciliation was binding on the city and county. For these reasons, we rule that the trial court was in error in reversing the order against these two plaintiffs on jurisdictional grounds.

Since the circuit court, sitting in review, ruled only on the question of jurisdiction, the usual practice would be for us to reverse the ruling as to the city and county and remand to the circuit court for that court to pass upon the merits. (*Lion Specialty & Properties, Inc. v. City of Chicago Zoning Board of Appeals* (1969), 107 Ill. App. 2d 354, 247 N.E.2d 30; *Hornstein v. Illinois Liquor Control Com.* (1952), 412 Ill. 365, 106 N.E.2d 354.) Because of the joint request of all of the parties, however, we elect to rule directly upon the merits.

Elwood Smith testified that in response to a newspaper advertisement of the Springfield-Sangamon County Regional Plan Commission, he met with Bradley Taylor, executive director of that group, on September 17, 1967. The meeting lasted for over two hours and Smith presented Taylor with his resume. Smith testified that he told Taylor that his present job as associate director of the Office of Economic Opportunity with the Community Action Program (C.A.P.) was being eliminated. Smith testified that Taylor told him that he, Taylor, was hoping to obtain someone with a degree in planning, but that if he did not, he would hire Smith. According to Smith, the two also met later on several other occasions and discussed the job, with Taylor indicating to Smith that he might be hired.

On or about May 20, 1968, Walter Shoults (who is white) was hired for the job. The advertisement for the job indicated that the Commission was seeking a "College Graduate with Training in Planning and Business Administration," and asked applicants to present a resume. Shoults had graduated from a two-year junior college. His employment had chiefly been with a local printing firm and did not include the administration of the business. The Commission hired Shoults without requiring a formal application or resume although the executive director did talk to Shoults' former employer. Defendant Smith (who is black) had a bachelor of science degree with a major in business administration and his varied work experience included five years in the sale of real estate, part of which was with his own firm.

John G. Cheeks, director of the Springfield office of the F.E.P.C., testified that, in investigating the case, he called upon Taylor and talked to him. Cheeks said that Taylor told him that he did not present Smith's

name to the Commission because he did not think that Smith was interested in the job and because he thought that Smith was too difficult to work with.

Taylor testified that he did meet with Smith for about two hours as Smith stated and did receive a resume from him. He stated that they discussed the job and the job Smith then had with O.E.O. Taylor also testified that Smith did not ask for the job and that they met only once after that when he told Smith that the job was still open and Smith made no response.

The only unfair employment practice charged by the amended complaint was the one alleged to have occurred when Shoults was hired. Later, during the conciliation attempts, the Commission agreed to consider Smith and, if they found him to be more qualified than Shoults, to fire Shoults and hire Smith. After discussing the job with Smith and writing to nine references furnished by Smith to the Commission, it rejected Smith. At Smith's request, the F.E.P.C. gave Smith leave to amend his complaint to include a charge that an unfair employment practice occurred by this rejection. The amended complaint, upon which the case was heard did not include such a charge, but the F.E.P.C. treated the charge as being before it and ruled that an unfair practice had occurred in that rejection. We need not determine whether the F.E.P.C. could properly consider a charge not alleged and one which concerned conduct during a period of conciliation because consideration of the occurrence would not change our ruling.

After Smith gave the Commission the names of nine references, Taylor wrote to them. Four did not answer. Of the five that did answer, three directly recommended that Smith be hired. One of the three was a former chairman of the C.A.P. program for which Smith had worked. Another, recommending Smith for the job, indicated that he thought that Smith would be easy to work with if given a chance. The former holder of the job Smith sought made no recommendation but indicated that he considered Smith to be "a reasonably informed, personable and intelligent individual." On the other hand, the former director of the C.A.P. program, under whom Smith had worked, described Smith as "unreliable in fulfilling his specific job responsibilities." This former director had resigned his position at the time of a dispute over Smith's continued employment. The minutes of the plan commission recited that Smith was rejected because he was "too controversial to make him eligible for such a sensitive job." The "joint secretary" of the Commission testified that the Commission also had concern over its inability to check upon Smith's former employment in New York which had resulted in litigation which his employer won.

As in many cases where racial discrimination in hiring is claimed, the

proof offered here was entirely circumstantial. The evidence amply supports a finding by the F.E.P.C. that Smith's presentation of a resume to Taylor together with their various conversations constituted an application for the job. The F.E.P.C. could also have found that Smith's education and work experience, including the selling of real estate, gave him sufficient objective qualifications for the position. In any event, those objective qualifications were superior to those of the person selected. If the F.E.P.C. believed Smith's testimony, it could determine that Taylor was purposely trying to avoid having to recommend Smith. Under the evidence, one inference that could be drawn was that Taylor did not want to recommend Smith because he was black. Another inference would be that he didn't want to recommend Smith because Taylor thought that he would be too hard to work with. Either inference would be consistent with Taylor's recommendation to hire Shoults with little investigation. The same inferences could be drawn if we consider the plan commission's subsequent reconsideration of the hiring and its ultimate decision not to hire Smith.

The controversy over the personality of Smith apparently centers around his former employment with the O.E.O. phase of the C.A.P. program. A director of the C.A.P. program apparently quit over a dispute as to Smith's continued employment. Only the most meager evidence was presented concerning the actions of Smith to which Taylor had objected at the time he chose not to recommend him. If evidence of the information available after the requests for letters of recommendation had been sent out is also considered, little more light is shed on the subject.

■■■ In cases charging discrimination in employment under the Title VII, claims that a person having the best objective qualifications has been rejected for lack of subjective qualification are looked on with suspicion by the courts. (*United States v. Hazelwood School District* (8th Cir. 1976), 534 F.2d 805.) Here, because the evidence of Smith's conduct which gave rise to concern for his lack of ability to work with others is so vague, we cannot determine that the finding of the F.E.P.C. that Smith was rejected for racial reasons is contrary to the manifest weight of the evidence.

The effect of our ruling does place a burden of explanation on an employing agency when rejecting a minority applicant in favor of a nonminority applicant who has inferior objective qualifications. A very similar procedure was adopted in *A.P. Green Services Division of Bigelow-Liptak Corp. v. Fair Employment Practices Com.* (1974), 19 Ill. App. 3d 875, 312 N.E.2d 314, where the court stated:

"The allocation of the burden of proof in an action challenging

employment discrimination was well established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 677, 93 S. Ct. 1817, 1824 (1973). The Supreme Court in referring to the prima facie case that must be initially put forward by the complainant stated:

'This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.' (Footnote omitted.)

Once this is done the burden shifts to the employer and it is incumbent upon him to rebut the prima facie case by some legitimate, nondiscriminatory reason for the complainant's rejection. If the employer discharges his burden of proof and meets the prima facie case of discrimination, the burden of proof then shifts back to the complainant and he must establish that the articulated reason for rejection is pretext. (*McDonnell Douglas Corp., supra.*)" (19 Ill. App. 3d 875, 880-81, 312 N.E.2d 314, 318.)

The footnote in *McDonnell Douglas Corp.* stated:

"The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. 792, 802 n. 13, 36 L. Ed. 2d 668, 677-78 n. 13, 93 S. Ct. 1817, 1824 n. 13.

We deem the manifest weight of the evidence test to be applicable to a court reviewing an administrative decision of the F.E.P.C. (*A.P. Green*, 19 Ill. App. 3d 875, 312 N.E.2d 314.) We do not understand a contrary rule to have been stated in *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 282, 215 N.E.2d 286, 295, where, in reversing a finding of unfair practice, the court noting that the statute requires the complainant to prove his case by a preponderance of the evidence, stated, "We are of the opinion that the alleged unfair employment practice was not established by a preponderance of the evidence." *Cf. Chicago Transit Authority v. Fair Employment Practices Com.* (1968), 103 Ill. App. 2d 329, 243 N.E.2d 638.

The circuit court's order reversing the order of the F.E.P.C. as to plaintiff Springfield-Sangamon County Regional Plan Commission is affirmed. The order of the circuit court reversing the order of the F.E.P.C. as to plaintiffs City of Springfield and Sangamon County is reversed, and the order of the F.E.P.C. as to those plaintiffs is affirmed. We remand the

case to the F.E.P.C. to determine the back pay to be due to defendant Smith.

Affirmed in part, reversed in part and remanded.

SIMKINS, J., concurs.

Mr. PRESIDING JUSTICE TRAPP, dissenting:

The record before this court does not establish that the Fair Employment Practices Commission has jurisdiction in this case.

Throughout the record of the administrative proceedings, the position is described as that of "Urban Renewal Planner-Administrator" with college training in "business administration". Section 2 of the Fair Employment Practices Act (Ill. Rev. Stat. 1963, ch. 48, par. 852) provides that "principal administrative officers" of a political or governmental entity are not "employees" as defined within the statute. So far as can be ascertained from this record the stated duties of the position required the preparation of "applications" and "contracts," apparently related to knowledge of urban renewal programs and a knowledge of finance and management. The proceedings before the administrative Commission does not show any consideration or determination of whether the complainant was an "employee" within the jurisdiction of that body.

It is conceded that at the time in question the Springfield-Sangamon County Regional Plan Commission had some eight employees and did not come within the terms of the statute. The statute, prior to July 1, 1968, defined "employer" as including, "or other governmental unit or agency thereof if within the foregoing requirements of the definition with respect to number of employees." Factors which persuade that the Regional Plan Commission was a distinct entity include the fact that the record shows that in the budget for 1970, some ten municipalities participated. These included the Airport Authority, a park district, a school district, as well as a number of smaller municipalities who participated in the Regional Plan Commission and contributed to its budget. The officers of the Regional Plan Commission were elected from its membership and it is this group which procured employees and staff. The fact alone that the county treasurer was the conduit for financial transactions of the Regional Plan Commission is not sufficient to negative a conclusion that the Regional Plan Commission was an autonomous entity.

The record shows that the county resolution did not provide any authority for the Sangamon County Regional Plan Commission to participate in the joint meetings of the representatives of the several municipalities. We are advised that the county does not have any

statutory authority to engage in any urban renewal planning or programs and, as the opinion notes the budget of the Springfield-Sangamon County Regional Plan Commission provided that no part of the salary of an "urban renewal administrator" was to be paid from the funds allocated by Sangamon County. For such reason it is not apparent from what source of authority this court can direct a judgment against Sangamon County for back pay and other liabilities for purported services in matters as to which the county had no authority to act.

It seems clear that as it functioned, the Springfield-Sangamon County Regional Plan Commission had no legitimate origin under any statute while the representatives of the several municipalities actually met together, but appears to have served as a convenient forum for interchange of views as to various aspects of planning.

As the opinion notes upon matters relating to the City of Springfield, only representatives of the Springfield Plan Commission could vote and employees were to be appointed upon the consent of the mayor. So far as the record shows, this was not done.

In the proceedings before the Fair Employment Practices Commission, there was no consideration or examination of the nature of the several entities involved in the proceedings for purposes of determining the "employer" within the context of the Fair Employment Practices Act. The record appears insufficient to show that the complaint at issue was within the jurisdiction of the administrative agency entering the order reviewed.