BURNHAM CITY HOSPITAL, Plaintiff-Appellee, *v.* HUMAN RIGHTS COMMISSION *et al.*, Defendants-Appellants.

Fourth District No. 4—83—0680

Opinion filed August 13, 1984.

1000

GREEN, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield, and Walter S. Clifton, Jr., of Urbana (Fredric D. Tannenbaum, Assistant Attorney General, of counsel), for appellants.

Stephen M. O'Byrne, of Reno, O'Byrne & Kepley, of Champaign, for appellee.

PRESIDING JUSTICE MILLS delivered the opinion of the court:
Discrimination?
Administrative law judge said yes.
Human Rights Commission said yes.
Circuit court said no.
We affirm.
On September 18, 1979, defendant, Walter S. Clifton, Jr., filed a complaint with the Illinois Fair Employment Practices Commission (FEPC) against plaintiff, Burnham City Hospital of Champaign (Burnham). He alleged a violation of section 3(a) of the Fair Employment Practices Act, which then stated:
> "It is an unfair employment practice:
> (a) For any employer, because of the race *** of an individual ***, to refuse to hire, to segregate, or otherwise to discriminate against such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment." (Ill. Rev. Stat. 1979, ch. 48, par. 853(a).)

Shortly thereafter, that Act was repealed and replaced by the Illinois Human Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 1—101 et seq.), which comprehensively treats various types of discrimination and provides for a Human Rights Commission (HRC) whose function includes those previously performed by the FEPC. The legislation provided for the HRC to proceed with cases pending before the FEPC. Ill. Rev. Stat. 1981, ch. 68, par. 9—102.
Prior to its termination, the FEPC filed a formal complaint

against Burnham on June 10, 1980, charging it with a violation of section 3(a) of the Fair Employment Practices Act because it refused to hire Clifton, a black male, as a pharmacy technician while hiring a less qualified white person. The case was heard on August 26 and 27, 1980, before an HRC administrative law judge who issued an opinion and recommended order on October 13, 1981. He found the charges to have been sustained. On January 8, 1982, the HRC approved the administrative law judge's report and entered the recommended order which included among its requirements that Burnham (1) make Clifton whole for lost wages he may have suffered, (2) cease and desist from such discrimination, and (3) report to the HRC within 45 days as to the steps it had taken in compliance.

Burnham appealed to the circuit court of Champaign County for administrative review. That court reversed the order of the HRC which, together with Clifton, has in turn appealed to this court. We affirm the circuit court.

In dealing with the allocation of burdens of proof and persuasion in cases where discrimination in employment is charged, the appellate court of this State has drawn an analogy to the procedures used in cases under the Federal Civil Rights Act. (42 U.S.C. sec. 2000e (1982); see *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed 2d 668, 93 S. Ct. 1817.) We did so in *Springfield-Sangamon County Regional Plan Com. v. Fair Employment Practices Com.* (1976), 45 Ill. App. 3d 116, 359 N.E.2d 174, *rev'd in part on other grounds* (1978), 71 Ill. 2d 61, 373 N.E.2d 1307, as did the Fifth District in *City of Cairo v. Fair Employment Practices Com.* (1974), 21 Ill. App. 3d 358, 315 N.E.2d 344. The First District gave full application to the Federal procedure in *A.P. Green Services Division of Bigelow-Liptak Corp. v. Fair Employment Practices Com.* (1974), 19 Ill. App. 3d 875, 312 N.E.2d 314.

The Federal cases on employment discrimination have proceeded on theories of (1) *disparate treatment*, which requires proof of a discriminating motive by the employer (*United States Postal Service Board of Governors v. Aikens* (1983), 460 U.S. 711, 75 L. Ed. 2d 403, 103 S. Ct. 1478), and (2) *disparate impact*, which involves employment practices which, without justified business necessity, fall more heavily on minority groups. (*International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843; *Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849.) In the case before us, the HRC found discrimination to have been proved under both theories.

██▌ ▌ By the terms of section 8—107(E)(2) of the Illinois Human

Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 8—107(E)(2)), the HRC is required to adopt the findings of fact of the administrative law judge unless they are contrary to the manifest weight of the evidence. That occurs when a contrary result is clearly evident. (*Clark Oil & Refining Corp. v. Golden* (1983), 114 Ill. App. 3d 300, 448 N.E.2d 958.) Similarly, when tested on administrative review, a decision of the FEPC could not be overturned by a reviewing court on the basis of the sufficiency of the proof, unless that decision was contrary to the manifest weight of the evidence. (*Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 426 N.E.2d 877.) This is the standard for most cases of administrative review and would logically be applied to review of decisions of the HRC. We apply that standard here.

## I

Under the *disparate treatment* theory, proof of discriminatory motive is critical, although it may be inferred in some situations from differences in treatment. (*International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 415 n.15, 97 S. Ct. 1843, 1854 n.15.) The method applied in such cases was described in *A.P. Green Services Division*:

> "The allocation of the burden of proof in an action challenging employment discrimination was well established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed 2d 668, 677, 93 S. Ct. 1817, 1824 (1973). The Supreme Court in referring to the prima facie case that must be initially put forward by the complainant stated:
>
> > 'This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'
>
> Once this is done the burden shifts to the employer and it is incumbent upon him to rebut the prima facie case by some legitimate, nondiscriminatory reason for the complainant's rejection. If the employer discharges his burden of proof and meets the prima facie case of discrimination, the burden of proof then shifts back to the complainant and he must establish that the articulated reason for rejection is pretext. (*McDonnell Douglas Corp., supra.*)" (19 Ill. App. 3d 875, 880-81, 312 N.E.2d 314,

318.)

The footnote in *McDonnell Douglas Corp.* stated:

> "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802 n.13, 36 L. Ed 2d 668, 677-78 n.13, 93 S. Ct. 1817, 1824 n.13.

The "bursting bubble" theory of presumption is operative in civil cases in this State. (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872.) In passing upon discrimination cases under title VII of the Civil Rights Act of 1964 as amended (42 U.S.C. sec. 2000e *et seq.* (1982)), the United States Supreme Court more recently has given similar treatment to the rule of *McDonnell Douglas Corp.* in *Aikens.* There, the court held that when the complainant makes a *prima facie* case, and the employer articulates a legitimate reason for its action, the presumption arising from the *prima facie* case is destroyed. The complainant then has the burden of proving the employer intentionally discriminated against him. He may do this directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer, or indirectly through proof that the employer's proffered explanation is not to be believed. (See *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) In other words, the trier of fact must decide which party's explanation of the employer's motivation it believes. *United States Postal Service Board of Governors v. Aikens* (1983), 460 U.S. 711, 716, 75 L. Ed. 2d 403, 411, 103 S. Ct. 1478, 1482.

The evidence before the administrative law judge clearly showed that Clifton was a member of a minority group, was qualified for the position of pharmacist's technician, had applied to Burnham for such a job, and was rejected. The undisputed evidence also showed Clifton (1) graduated from high school and attended the University of Illinois until 1972, when he joined the Army, (2) graduated from the Army's medical field services school in January 1973 and was assigned to the pharmacy at Fort Gordon, Georgia, (3) was assigned by the Army to a four-month pharmacy technician course from which he graduated in the top 5% of his class, (4) served as a pharmacy technician until his discharge from the Army in August 1975, (5) then attended the University of Illinois where he received a bachelor's degree in economics in 1977 and a degree from the College of Law in 1980, and (6) while attending college, held several jobs, some of which were during the

summer.

During the period from 1975 until the hearing, Harold Wolf was Burnham's director of pharmaceutical services. Clifton testified he met with Wolf in November 1975 to discuss his qualifications as a pharmacy technician and to give Wolf a copy of his resume. Clifton spoke to Wolf again in March 1976 and in March or May of 1977. Both times Clifton inquired about the possibility of being hired as a pharmacy technician. Wolf recalled having some conversations with Clifton but denied ever receiving Clifton's resume. Clifton testified he made numerous applications for a job as pharmacy technician. Applications executed by Clifton in 1977 and 1979 for such a position were introduced into evidence. The evidence indicated that earlier applications would not still have been in Burnham's records.

Burnham placed advertisements about the June 1979 opening in a local newspaper. The Hospital's personnel department collected about 25 applications and forwarded them to Wolf. The applications themselves did not indicate the applicant's race. Wolf selected three applicants for an interview. None of the three chosen had any experience related to pharmacy work. Wolf hired one of those interviewed, a white male.

When asked about the requirements for the job opening, Wolf testified he looked for someone who would provide job stability. Wolf had recently become concerned with stability due to the unreliability exhibited by an employee whose application showed a "gap" of two to three months in describing his previous employment. Wolf discharged the employee and later learned the employee had had employment during the "gap" about which he would not have wanted Burnham to know. Wolf was unclear as to whether he focused on the applicant's prior work record or all of the applicant's prior activities in determining stability.

The administrative law judge found Clifton had established his *prima facie* case. That judge also held Burnham had rebutted the *prima facie* case by offering legitimate nondiscriminatory reasons for Clifton's rejection. At this point, the presumption of discrimination dropped from the case. The trier of fact had to decide the ultimate issue, whether Clifton's rejection was racially premised. The administrative law judge concluded it was. The question we must address is whether this conclusion is against the manifest weight of the evidence.

The administrative law judge's conclusion rested on two findings. First, he determined Clifton was more qualified than the applicant that Burnham hired. Generally, an employer who rejects a minority

candidate in favor of a nonminority candidate with inferior qualifications has a burden of explanation. (*Springfield-Sangamon County Regional Plan Com. v. Fair Employment Practices Com.* (1976), 45 Ill. App. 3d 116, 126, 359 N.E.2d 174, 181.) While the trier of fact's belief that the employer misjudged the applicant's qualifications alone does not render the employer liable, it may be probative of whether the employer's reasons for the rejection are pretext for discrimination. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 259, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097.) Under the circumstances in this case, we find the administrative law judge's determination irrelevant to the ultimate issue.

Unlike Burnham's previous advertisements, which included a statement that experience was preferred, the one in June 1979 stated Burnham was "willing to train." Wolf explained this change in policy was due to a pharmacy apprentice who would be working in the department for the summer in addition to the full quota of pharmacy technicians. This would reduce the load on the latter so that it would be feasible to hire a person with no experience, but who could be trained. Applications of others not interviewed confirmed Wolf's testimony on this point. Several applicants had experience and training similar to Clifton's but were not interviewed.

■ In order for Clifton's superior qualifications to be proof of Burnham's intent to discriminate, several inferences must be made. First, before it advertised for the position, Burnham must have known Clifton would apply. Burnham also must have changed its employment policy to avoid interviewing Clifton, although it had made no such effort when Clifton had applied in the past. Finally, Burnham must have rejected all of the most qualified applicants without determining their race simply to avoid interviewing Clifton. None of these inferences is even remotely likely. Rather than being proof of Burnham's intent to discriminate, the evidence demonstrates that Clifton's experience was treated no differently than the experience of any other applicant.

■ The second ground supporting the administrative law judge's conclusion was his determination that Burnham's proffered explanation was not to be believed. According to the administrative law judge, Burnham rejected Clifton solely because he lacked a stable employment history. The administrative law judge noted Burnham generally was not concerned with applicants' work histories, and, therefore, he concluded Burnham's reason must have been a pretext for discrimination.

To support his finding that Burnham was not concerned with

work histories, the administrative law judge noted three applicants who were not interviewed had more stable work histories than the three who were interviewed. There was no showing, however, that the first group met the other requirements for the job. The administrative law judge also noted three employees in Wolf's department had unstable work histories, but two of the three had been hired before stability became a factor in hiring. In fact, one of these two was the former employee whose unreliability forced Wolf to become concerned with stability. The third employee was hired in September 1979. None of the circumstances surrounding this hiring were presented. Whether other applicants for that job had stable work histories is not known. Moreover, Burnham no longer had its summer apprentice, and presumably, experience became a factor again. The applicant hired in September 1979 had experience as a pharmacy technician.

By focusing on the applications of others rather than Clifton's, the administrative law judge missed Wolf's real reason for rejecting Clifton. Clifton's application in June 1979 listed his bachelor's degree obtained in 1977 and his experience as an Army pharmacy technician from 1972 to 1975. The application, however, made no reference to (1) Clifton's attendance at Army specialized schools, (2) any employment after he left the Army except for a one-year stint as a desk clerk at a motel while doing his undergraduate work, nor (3) his enrollment in the College of Law from the fall of 1977 until the time of the application. Clifton maintains he did not mention his law school enrollment because that information was not responsive to any question on the application form. The form, however, did request information concerning any professional training and any college post-graduate training the applicant had taken. Clifton left those portions of the form blank. Thus, Clifton's application revealed none of his activities between November 1977 and the day he filled out the application.

Clifton was denied an interview because he chose not to fully and candidly complete his application. Wolf was concerned with applicants who concealed information. Clifton's failure to account for most of the two years immediately preceding the application date certainly indicated some concealment. In Wolf's own words, the problem with Clifton's application was:

> "[W]e gotten [sic] almost two years, or a year and a half, at least, of not knowing exactly what the applicant was doing during that time, or, you know, if they were working or going to school or whatever."

Regardless of Clifton's lack of a stable employment history, Burnham

had every right to deny Clifton an interview on this ground alone. Nothing in Clifton's qualifications, his prior conversations with Wolf, the applications of other candidates, or any of the other evidence rebuts this legitimate nondiscriminatory reason for Clifton's rejection. As it turned out, Wolf was justified in being wary of Clifton's application. A full-time law student would have difficulty holding down a full-time hospital job.

 █ We also note the administrative law judge virtually ignored one fact that clearly demonstrates Burnham's intent to discriminate, or lack thereof. Of the eight employees working as pharmacy technicians under Wolf, one was black. Proof of a racially balanced work force, while not conclusive, is relevant on the issue of intent. (*Furncoe Construction Corp. v. Waters* (1978), 438 U.S. 567, 579, 57 L. Ed. 2d 957, 969, 98 S. Ct. 2943, 2951.) In this case, we find it extremely probative of Burnham's intent, for Wolf had hired the black employee in May 1979. Thus, one month before Clifton's rejection, Burnham had hired a member of Clifton's race for the same position for which Clifton later applied. This fact alone tends to strongly negate any inference that the refusal to interview Clifton was racially motivated. When joined with Clifton's failure to complete his application, it becomes clearly evident that Burnham never intentionally discriminated.

## II

 We must then consider whether Burnham unintentionally discriminated. A three-part analysis is applied to *disparate impact* claims. To establish a *prima facie* case, the complainant must show that a racially neutral practice has a significantly discriminatory impact. Once that showing is made, the employer must demonstrate that the practice has some manifest relationship to the employment in question. If the employer does so, the complainant may still prevail if he proves the employer used the practice as a mere pretext for discrimination. *Connecticut v. Teal* (1982), 457 U.S. 440, 447, 73 L. Ed. 2d 130, 137, 102 S. Ct. 2525, 2531.

The administrative law judge held Burnham's stability requirement had a significantly discriminatory impact on blacks. He characterized Burnham's policy as one which excluded applicants who had "gaps" in their employment history. He noted this requirement excluded persons who had been unemployed. Because the black unemployment rate is higher than the white unemployment rate, he concluded that the requirement had a discriminatory impact.

 █ Burnham argues Wolf searched for "gaps" in the full history of an applicant, not just in the work history. Burnham further as-

serts Clifton failed to establish his *prima facie* case because he failed to prove a higher percentage of blacks than whites had such "gaps." In ruling on the disparate treatment issue, the administrative law judge found Wolf did not seek applicants with stable work histories. This finding is totally incongruous with holding Burnham liable under a disparate impact theory based on the same employment practice. If Burnham did not follow the practice, then it would not have any discriminatory impact on blacks. The administrative law judge noted the practice had not been applied either before or after June 1979. He also noted one of the three applicants that Wolf interviewed had a "gap" in employment listed on the application.

Moreover, Clifton failed to show how the unemployment rate correlated to "gaps" in employment. The only evidence introduced on the disparate impact charge was the testimony of Norman Kelewitz. As a labor market economist, Kelewitz made estimates of the civilian labor force in Champaign County. He accomplished this by taking the figures from the 1970 census and using experience factors to calculate changes in the work force. These factors included new entrants, re-entrants, and those going to school. Kelewitz then did a sampling to see if his figures were accurate. Kelewitz also broke his data down to show the racial classification of the work force, but he did no calculations or sampling. Instead, he took the figures directly from the 1970 census. In the same manner, he took the black and white unemployment rates from the 1970 census and presumed the same rates existed in 1979. The 1970 unemployment rate for blacks was 8.4%, while the unemployment rate for whites was 4%.

Thus, from only the 1970 unemployment rates, the administrative law judge concluded more blacks than whites had "gaps" in their employment histories. If an individual is unemployed, he would certainly have a gap in employment. It does not necessarily follow, however, that the race with the highest unemployment rate must have a higher percentage of "gaps" in employment. For example, if the average unemployed black is out of work twice as long as the average unemployed white, then the same percentage of whites and blacks would have "gaps" due to unemployment although the black unemployment rate would be twice the white unemployment rate. Furthermore, "gaps" in an employment record can appear for reasons other than being unemployed. Those who are ill, in school, or not seeking work would have a "gap" without being included in the unemployment rate. Those who did not list their previous jobs on the application form would also have a "gap" without being unemployed. While Kelewitz included some of these factors in calculating the size of the en-

tire labor force, he did not calculate the black or white unemployment rates. It is impossible to conclude that a practice of excluding applicants with "gaps" in employment has a significantly disparate impact on blacks solely from the unemployment rates.

For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

TRAPP, J., concurs.

JUSTICE GREEN, dissenting in part and concurring in part:

I would uphold the decision of the HRC except to the extent that it orders Burnham to make Clifton whole for lost wages. As to that issue, I consider the appropriate measure to be a remandment to the HRC pursuant to section 3—111(a)(7) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 3—111(a)(7)) for further evidence and reconsideration. Accordingly, I would (1) reverse the judgment of the circuit court except to the extent that it reverses the portion of the HRC decision ordering reimbursement for lost wages, and (2) affirm that portion of the judgment, but remand to the circuit court with directions that the case be remanded to HRC for further hearing as above described.

The HRC did not determine the amount of back pay to which Clifton was entitled. Under the existing order, there is no way that Burnham can comply with that portion of the HRC decision unless Burnham and Clifton could reach agreement as to an amount. Notably, the HRC did not order Burnham to employ Clifton, apparently because it did not believe that Clifton would then want the job in question. Perhaps, Clifton would likewise have not been ready, willing, and able to perform the work up to the time of the decision. Furthermore, I share the concern of the majority as to whether Clifton, as a third-year law student, was in a position to perform the work at the time of the hiring.

The record before the HRC and its decision indicate that insufficient attention was given to this aspect of the case. Section 3—111(a)(7) of the Code of Civil Procedure permits the circuit court "to remand for the purpose of taking additional evidence when from the state of the record of the administrative agency or otherwise it shall appear that such action is just." (Ill. Rev. Stat. 1983, ch. 110, par. 3—111(a)(7).) This would appear to be the appropriate course of action in this case. (*Sola v. Clifford* (1975), 29 Ill. App. 3d 233, 329 N.E.2d 869;

*Rizzo v. Board of Fire & Police Commissioners* (1973), 11 Ill. App. 3d 460, 297 N.E.2d 247.) The HRC should hear further evidence as to whether Clifton would have been in a position to take the job and, if so, what amount he should be awarded for lost earnings.

The majority correctly sets forth that, under the *disparate treatment* theory, the critical issue is whether the employer's motive is discriminatory. Thus, the insufficiency of the record and of HRC's decision to deal with the question of whether Clifton suffered lost earnings does not necessarily detract from the determination that Burnham was guilty of discrimination. The unavailability or shortcomings of the applicant is generally immaterial unless known by the prospective employer. As also properly stated by the majority, we are bound by the HRC determination that discrimination was proved *unless a different decision was clearly evident.* While an HRC decision favorable to Burnham would find support in the record, I do not find such a decision *to be clearly evident.* As with the verdict of a jury, we are required to give deference to the decision of the HRC, whose administrative law judge heard and saw the witnesses, and who was better able than we are to appraise their credibility and accuracy.

The majority correctly describes the allocations of the burdens of proof and persuasion under the *disparate treatment* theory and that under the evidence here, Clifton had the burden of persuasion, without the benefit of any presumptions, that Burnham had discriminated against him. The circumstantial evidence presented supports the HRC's determination that Clifton had sustained that burden by showing that Burnham's explanation for his rejection was not accurate. *United States Postal Service Board of Governors v. Aikens* (1983), 460 U.S. 711, 75 L. Ed. 2d 403, 103 S. Ct. 1478.

One of the crucial aspects of the case, where the administrative law judge's vantage point was superior to ours, was in evaluating Clifton's explanation of the number of times he had applied for work at the Burnham pharmacy and of the extent of his conversations with Wolf. From this evidence, the judge could have concluded that Wolf was aware that Clifton would be likely to apply for the opening which gave rise to this dispute. While, as the majority points out, if Burnham intended to discriminate, the steps taken to do so were quite complicated, the hiring procedure adopted at this time was one which had never been used previously and was one which was apparently not used subsequently. In fact, when a subsequent vacancy was filled in the summer of 1979, it was filled by a person with experience whose resume showed substantial gaps. Of those persons denied interviews at the same time as Clifton, several had resumes showing

greater experience, training and job stability than those granted an interview.

The stated reasons for the special hiring procedures used were twofold: (1)(a) A recently terminated unsatisfactory employee had presented a resume which showed "gaps" in his employment record, and (b) Wolf had later learned that the employee had prior unstated employment which, had it been known to Wolf, would have caused the employee to have been rejected; and (2) the requirement of experience for an employee was not as important during the summer of 1979, because an apprentice would be available to help during that summer. The explanation was logical. As determined by the hearing officer, it "burst the bubble" of any presumption in favor of Clifton, but it did not require a determination against Clifton. *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872.

Several matters could have been considered by the HRC in weighing the good faith of the Burnham explanation. Wolf's testimony was somewhat ambiguous as to whether the focus of the alleged special policy used for the occasion was on the applicant's prior work record or on all of the applicant's prior activities. The testimony was also unclear as to whether the focus was on determining whether the applicant had been unemployed or on knowing what employment the individual had previously held so that inquiry could be made to see if the employment was in an improper occupation or with an employer who was dissatisfied with the work. As in determining the weight to be given to Clifton's testimony, the person in the best position to determine the weight to be given to this testimony was the administrative law judge.

The HRC and its hearing officer may also have considered whether the addition of a pharmacy apprentice would substitute for the need for experience by the technician to be hired. The work load would be reduced with more people to do the work, but there was no showing that the apprentice would have the experience to substitute for that which an experienced technician would possess. The HRC and its hearing officer may also have wondered whether the problem of "gaps" in the employment record of an applicant might be handled reasonably well by questioning the applicant at an interview.

Clifton's latest resume given at the time of the application in question did leave much to be desired and did contain "gaps." Burnham may very well have eliminated him from consideration because of those gaps. The majority properly mentions that the existence of a recently hired black employee among the eight Burnham pharmacy technicians is a circumstance tending to negate a discrimi-

natory intent upon Burnham's part. Nevertheless, in view of the circumstantial evidence presented, particularly the one-time hiring policy used on the occasion, I cannot say that a determination *different* from that of the HRC in regard to the proof under the *disparate treatment* theory is *clearly evident*.

I agree with the majority that the proof failed under the *disparate impact* theory.