BOARD OF EDUCATION, DOWNERS GROVE SCHOOL DISTRICT NO. 99, Plaintiff-Appellee, *v.* ILLINOIS FAIR EMPLOYMENT PRACTICES COMMISSION, Defendant-Appellant.

Second District   No. 78-312

Opinion filed December 7, 1979.

William J. Scott, Attorney General, of Chicago (Paul J. Bargiel, Karen Konieczny, and Gregory C. Lawton, Assistant Attorneys General, of counsel), for appellant.

Jerome N. Robbins and Stanley B. Eisenhammer, both of Robbins, Schwartz, Nicholas & Lifton, of Chicago, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The Fair Employment Practices Commission of the State of Illinois (FEPC) decided that the Board of Education, Downers Grove School District No. 99 (the Board), had discriminated against Ms. Nadja Nadea

Ballinger (the complainant) on the basis of sex (Ill. Rev. Stat. 1977, ch. 48, par. 853(a)) in refusing to hire her for a radio and television teaching position at Downers Grove South High School. The circuit court reversed. The FEPC appeals, contending that its decision was not against the manifest weight of the evidence and should have been upheld.

The complainant had been employed since 1971 as a teacher by the Board, which operated a north and a south high school as separately administered facilities. She was at the North High School and primarily taught English and Speech courses including "skills" courses for "low-level" students, and also was a forensic coach. In 1973 she requested a transfer to a position at the South School which included courses in radio, television, and the management of the school's radio station.

W. Robert Foskett, a teacher at South High School, who had filled the position in question, unexpectedly resigned, and the complainant decided to apply for the position. Immediately prior to the Board's receipt of defendant's application on March 20, 1973, Foskett's teaching responsibilities had been divided and filled temporarily by substitute teachers Ms. Ringel and Mr. Holliday. Each of these persons was employed for the period from April 2, 1973, until the close of the 1972-1973 school year with each being assigned to two-fifths of Foskett's former teaching load and with Holliday being given charge of the radio station and the radio broadcasting course previously taught by Foskett.

During May and June, the Board engaged in the employment process for the 1973-1974 school year and interviewed various applicants, including the complainant. The complainant was given a 45-minute interview with Dr. Neumann, principal of the South High School, with the assistant principal Mr. Phillip Bowers and the chairperson of the speech department at South, Ms. Wood, participating in the interview. During the interview the complainant was informed by Dr. Neumann that Mr. Erickson, a substitute teacher at South, had been hired the day before to assume approximately two-fifths of Foskett's previous position but that she was being considered for a position consisting of the balance of Foskett's duties. Included was a partial position in radio and television with the rest of the class load consisting of English classes or classes in developmental education. At the end of the interview complainant was led by Ms. Wood on a tour of the South High School, including the radio station facilities.

Ms. Wood was asked whether she had formed any opinion as to the complainant's candidacy at that time. She said she didn't think she had arrived at the opinion stage but she had two concerns, one the applicant's "extreme concern with the radio station" and the other her "tendency to dominate the conversation."

Ms. Wood also referred to a conversation between the complainant

and students at the radio station at the time of her visit. She related that the complainant asked the boys how they would feel about a "lady boss"; and that a student answered, "Well, lady, sex has nothing to do with this. But, we've had one difficult adjustment to make, and we would prefer not to make another" (referring to Foskett's recent departure). There was apparently no rejoinder by the complainant except to refer to some other matters which she observed.

Complainant was interviewed by Mr. Bowles on June 1, 1973. There was evidence that Bowles subsequently told Dr. Neumann that one of his reasons for not recommending the employment of complainant by South was that the interview focused primarily on her interest in radio and radio management as opposed to instructional aspects of the available positions. However, there was evidence that although the two positions were to deal with "low ability" students, Bowles did not inquire or discuss complainant's teaching experience or her philosophy of teaching.

After the interviews Dr. Neumann conferred with all the interviewers, Bowles, Bowers and Wood. He testified that they recommended that the complainant should not be employed at the school. He said that, based upon these recommendations and his own interview, Dr. Neumann determined that complainant should not be hired because she would not be compatible with the staff at South.

There was also evidence that prior to complainant's interviews, the assistant principal of North had telephoned Bowers with regard to complainant's application and told him that she had received a superior rating for 1972-73 and that they were "pleased with her work at North." There was further evidence that Bowers had received this information and also, in his opinion, that Freese was a good evaluator of teachers. However, testimony by Dr. Neumann was that he had not received the report concerning Freese's favorable statements until after the complainant was informed she would not be accepted for the position. Neither Dr. Neumann, Bowers nor Wood contacted anyone at North concerning complainant's performance as a teacher.

Ms. Cantrell, who was also one of complainant's evaluators at North, testified that complainant was a "superior" teacher; that she was "inventive and creative"; that she was "particularly patient" with the students, and "able to bring about the best kind of work that they were capable of doing"; she was "firm," but "in no way was she a dictatorial teacher"; and that she was "very good" at cooperating with other faculty members, "particularly because she listens to people and takes their opinion into account."

Both Mr. Holliday and Ms. Ringel were offered contracts for full time positions in the 1973-74 school year. Holliday's position included the supervision of the school's radio station. He accepted the offer but Ms.

Ringel turned down the position for personal reasons. Additionally, Ms. Mahara and Mr. Erickson were offered positions. There was evidence that Mr. Erickson was interviewed by the chairman of the developmental education department during the week of June 1, 1973, and was offered a teaching contract on May 31, 1973, by the assistant superintendent for personnel. The complainant testified that at her first interview on May 31, 1973, Dr. Neumann informed her that Erickson had already been hired to assume part of Foskett's previous position. Dr. Neumann stated that the evaluations of Holliday received from Wood and Babich were a more important factor in his decision to employ Holliday than the interview conducted in March for the temporary assignment of nine weeks.

On June 6, 1973, Dr. Neumann wrote a memo to complainant thanking her for her visit in regard to "the radio job and a position in the Speech Department" and telling her that Holliday had been hired "for this position." Complainant met with Dr. Neumann on June 15, 1973, and was told that it had been determined to retain Holliday because he was more compatible with the staff at South even though she was well qualified and there was nothing wrong with her credentials or past teaching performance. Complainant asked Dr. Neumann to compose a letter stating the precise reason she was not hired for the position. In response, Dr. Neumann wrote to her on June 25, 1973, stating "Your credentials are fine and there is no question about your ability to perform as a teacher," but that a decision had to be made as to the candidate "who will best fit into the already existing structure and personalities" and "in the case of the radio station manager it was the opinion of a number of us * * * that we should employ Mr. Holliday over all the other candidates."

There was also evidence that the decision was based upon the performance of Holliday over the nine-week temporary period and that this decision was influenced by the fact that the complainant in the interviews displayed what was considered a tendency to dominate the interview. Additionally, based on the interview the educators felt that the complainant's overwhelming desire to manage the radio station might be symptomatic of a lack of motivation to teach other academic courses. They also considered that complainant displayed a weakness in her ability to communicate with the student members of the radio station.

The Board's failure to transfer the complainant did not cause her salary to decrease since no extra compensation was involved in managing the radio station. On July 29, 1974, complainant submitted her resignation from the school district in order to pursue other career opportunities.

On July 30, 1973, the complainant filed a complaint of an unfair employment practice with the FEPC; a complaint was thereafter filed by the FEPC against the Board on January 28, 1974; a public hearing was held at which the hearing officer determined that complainant had been

discriminated against on the basis of sex; and finally the FEPC adopted the position of the hearing examiner, finding the decision to be supported by the evidence.

The Board sought judicial review, resulting in the order appealed from. The circuit court reversed, ruling that (1) defendant had not been discriminated against on the basis of her sex; (2) that the Board properly rebutted defendant's *prima facie* case, but that the commission improperly substituted its own judgment as to which applicant was best qualified; and (3) that the FEPC exceeded its authority in attempting to grant tenure, in any event.

The FEPC contends that the decision in favor of the complainant based on sex discrimination is supported by substantial objective evidence; and that the subjective reasons asserted by the Board were pretexts designed to disguise discrimination. The Board counters that the subjective reasoning of Board was based on nondiscriminatory factors, that the Commission erred in giving less weight to these legitimate reasons for not hiring the complainant for the particular job opening, and that the circuit court properly redressed this error.

■■ Implicit in this dispute is an inquiry into the proper standards for judicial review of the decisions of this administrative agency. The Fair Employment Practices Act specifically provides that the agency's "determination sustaining a complaint shall be based upon a preponderance of the evidence." (Ill. Rev. Stat. 1977, ch. 48, par. 858.01(c).) We have held that upon judicial review of the administrative decision the circuit court and the reviewing court must examine the record to determine whether the discrimination was proved by a preponderance of the evidence and, whether applying that standard of proof, the agency's decision is against the manifest weight of the evidence. (*Northern Illinois University v. Fair Employment Practices Com.* (1978), 58 Ill. App. 3d 992, 994-96.) As in any judicial review of an administrative decision, the findings and conclusions of the administrative agency on questions of fact "shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1977, ch. 110, par. 274.) This, of course, recognizes the usual presumption in favor of the trier of the facts and its greater opportunity to weigh and evaluate conflicting evidence by seeing and hearing the witnesses.

As noted in *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 274:

"Deference is unquestionably due the factual determinations of an agency charged with the primary responsibility for adjudication in a specialized area. (See, *e.g., Kellogg Switchboard and Supply Corp. v. Department of Revenue,* 14 Ill. 2d 434, 439.) The wisdom of this principle of judicial review is emphasized when the

agency's area of competence involves the subtleties of conduct often present in cases of racial discrimination. As the New York Court of Appeals observed, 'One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive * * *.' (*Holland v. Edwards*, (1954), 307 N.Y. 38, 119 N.E.2d 581.) We agree with the circuit court that the Commission must be allowed reasonable latitude in drawing inferences of discrimination from competent circumstantial evidence."

The parties have both referred to a three-part test for dealing with employment discrimination questions under Federal Title VII which we agree may be helpful in reviewing the evidence under the Illinois Fair Employment Practices Act. (See *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) *McDonnell Douglas* noted that a *prima facie* case of racial discrimination under Title VII may be made by showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (411 U.S. 792, 802, 36 L. Ed. 2d 668, 677, 93 S. Ct. 1817, 1824.) It is recognized that the specification of the usual elements of *prima facie* proof will not necessarily be applicable in every respect to different factual situations. (411 U.S. 792, 802 n. 13, 36 L. Ed. 2d 668, 677-78 n. 13, 93 S. Ct. 1817, 1824 n. 13; see also *Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 575-76, 57 L. Ed. 2d 957, 966, 98 S. Ct. 2943, 2949.) The United States Supreme Court has also warned against equating a *prima facie* showing under *McDonnell Douglas* with an ultimate finding of fact as to discrimination. It notes that the central focus of the inquiry in a discrimination case is whether, when the evidence is evaluated in the light of common experience, it shows that the employer is treating some people less favorably because of, for example, sex. *Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 577, 57 L. Ed. 2d 957, 967, 98 S. Ct. 2943, 2949.

However, the burden which shifts to the employer after the complainant has made a *prima facie* case "is merely that of proving that he based his employment decision on a legitimate consideration * * *." (*Furnco*, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 968, 98 S. Ct. 2943, 2950.) Granting *certiorari* in *Board of Trustees v. Sweeney* (1978), 439 U.S. 24, 58 L. Ed. 2d 216, 99 S. Ct. 295, the majority of the court was of the opinion that the employer need only state a legitimate nondiscriminatory reason

to shift the burden back to the complainant to show that the reason is pretext, and that the burden is not on the employer to prove lack of discrimination.

This court has recognized that in the employment of professional teachers there are intangibles involved in rating ability and that there must necessarily be subjective elements which are considered in the process. (*Northern Illinois University v. Fair Employment Practices Com.* (1978), 58 Ill. App. 3d 992, 1000. See also *School District No. 175 v. Illinois Fair Employment Practices Com.* (1978), 57 Ill. App. 3d 979, 985.) The Board here argues that the error in the agency's determination is that they gave no consideration to subjective factors. Any analysis of whether this is in fact so must necessarily involve a determination of the credibility shown in the record of the subjective reasons advanced by witnesses for the Board for not hiring the complainant. In *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, the Illinois Supreme Court noted "that the Commission must be allowed reasonable latitude in drawing inferences of discrimination from competent circumstantial evidence." 34 Ill. 2d 266, 275.

■■ Based on these general principles we approach the particular facts of this case. All of the parties apparently agree that complainant has proved a *prima facie* case. From the purely objective facts in the record it would appear that the complainant is considerably better qualified than either of the two men who were chosen to fill the radio and television teaching position. Complainant graduated from Indiana University with a double major in English and in radio and television. In addition, she had a broadcasting license and had spent two years working at a radio station. She also had had two years' experience as a full-time teacher and had received excellent evaluations from her teaching supervisor. On the other hand, the two male candidates chosen to fill the radio and television teaching slot had 2 2/3 hours and 6 hours of radio experience respectively. Neither of the male applicants had any full-time teaching experience as they both were substitute teachers for one year after their graduation. Thus, the choice of the male applicants over the complainant established a *prima facie* case.

In meeting that case the Board's witnesses articulated several non-discriminatory reasons for not hiring the complainant. They concluded, primarily from her visit at the radio station, that she exhibited a domineering personality which might interfere with her relationships with students and fellow teachers. In addition, witnesses articulated the fact that complainant's interest in radio was excessive and might indicate a disinterest in teaching her other areas of responsibility. Moreover, the witnesses expressed ostensibly nondiscriminatory reasons for rejecting the complainant in the positive evaluations which were given to the men

who were hired. In the case of Mr. Holliday this included the positive evaluation given by Ms. Wood, his supervisor for nine weeks. She stated that he had done a commendable job in replacing an extremely popular teacher who left suddenly during the semester, was able to establish rapport with the students and involved them in the operation of the station, a relationship which the school was reluctant to disturb. The Board also points to facts which would be corroborative of its nondiscriminatory motive. It notes that in addition to offering Mr. Holliday the portion of the vacant position they also offered Ms. Ringel the continuance of her temporary employment. And they note the ratio of women and men teachers in the system is approximately even with no substantial evidence of any particular policy or practice of sex discrimination.

On the other hand, there are facts in the record which lend some inferential support to the commission's response that the Board's reasons for not hiring the complainant were mere pretext. Aside from the single incident at the radio station, the Board offered no evidence as an explanation of how the complainant might be incompatible or tend to dominate a classroom; and in fact the report of her supervisor in her previous teaching experience showed that the complainant had a very fine relationship with the students. Also, the fact that the Board made special pains to secure an evaluation of Holliday's teaching but did not make a similar inquiry before rejecting the complainant adds some weight to the claim of pretext.

■■ However, when the whole record is considered, it does not support the finding that the Board discriminated against the complainant because of her sex.

The FEPC has focused upon two factors, complainant's superior qualifications and the claimed different treatment accorded her in the selection process as demonstrating sex discrimination.

■■ On the subject of her qualifications, the Board was not under compulsion to hire the best objectively qualified person for any position, providing of course that discrimination was not the basis for its decision. It has been recognized that the courts are not the forum to redress even obvious mistakes made by public agencies in hiring personnel, provided no curtailment of an employee's protected rights is involved in the decision. *Cf. Bishop v. Wood* (1976), 426 U.S. 341, 349-50, 48 L. Ed. 2d 684, 693, 96 S. Ct. 2074, 2080.

The Board could therefore, even if its judgment were considered faulty by us based on objective standards, give weight in its hiring judgment to its subjective evaluation of the various candidates' qualifications, providing the Board was not using its assessment process as a pretext to cover discrimination on account of sex. It is true, as we have

previously noted, that subjective qualifications by their nature are inherently less credible and demand a more searching exploration. But on careful examination there is a reasonable explanation which supports the credibility to be afforded the reasons advanced by the Board based on the subjective factors.

There was testimony that Holliday was filling the position sought by complainant in a very capable manner and evidence that the Board gave considerable weight to his past performance in offering him the position. There were also circumstances which disclosed that the different treatment accorded to complainant in the selection process was not based upon her sex. Similarly situated persons were treated the same. Candidates presently filling the position, Mr. Holliday and Ms. Ringel, were treated alike in that they were not reinterviewed after their 9-week contracts but had special evaluations prepared by their supervisors at Downers Grove South. Thus the differences in treatment were based upon the permissible criteria of the applicant's status as to the South school and not upon sex. *Cf. Green v. McDonnell Douglas Corp.* (8th Cir. 1976), 528 F.2d 1102, 1105.

■■ The fact that the Board failed to interview the complainant's supervisors raises some suspicion of discrimination. But mere suspicion does not justify a finding that discrimination in fact occurred since that determination must be based upon a preponderance of the evidence. (*Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 282.) The hearing officer heavily relied upon his determination that the Board's witnesses were not credible in making his finding. Although credibility determinations of the hearing officers are entitled to special weight (see, *e.g.*, Davis, Administrative Law Treatise §10.04, at 314-15 (1976 Supp.)), he is not wholly free to ignore testimony which is not inherently incredible or refuted by other witnesses. We find that the testimony of Ms. Wood as to why she recommended Holliday does not strain credulity and was not rebutted. In fact, complainant testified that Ms. Wood initially encouraged her to apply for the position. Also, the fact that a woman, Ms. Ringel, was also offered a position supports the Board's assertion that sex was not a factor in hiring.

It was complainant's initial burden to show that the ostensibly legitimate reasons expressed by the Board for not hiring complainant were pretextual, since if the actions remained unexplained it is more likely than not that they were based on discriminatory criteria. (*Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 576, 57 L. Ed. 2d 957, 966, 98 S. Ct. 2943, 2949.) Here, in our view, the stated reasons are supported on proper grounds. It seems apparent that there were personality conflicts between complainant and those responsible for her hiring with the result that although she was most highly qualified the

personnel decision was against her. However, personality conflicts do not rise to the level of sex discrimination.

The finding of FEPC that the complainant was discriminated against on account of her sex is against the manifest weight of the evidence on the record before us, as the trial court found. We therefore affirm the judgment of the Circuit Court of Du Page County.

Judgment affirmed.

WOODWARD and NASH, JJ., concur.