THE CITY OF CHICAGO, Plaintiff-Appellant, *v.* ILLINOIS FAIR
EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellees.

First District (1st Division)   No. 79-1378

Opinion filed August 11, 1980.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke and Cheryl L. Smalling, Assistant Corporation Counsel, of counsel), for appellant.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago (Barbara Baran, of counsel), for appellee Susie A. Bates.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

The City of Chicago (plaintiff) appeals from a judgment affirming a decision of the Illinois Fair Employment Practices Commission (FEPC) (Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*). The FEPC ruled plaintiff had discriminated against its female custodial employees including Susie Bates (complainant) on the basis of sex (Ill. Rev. Stat. 1979, ch. 48, par. 851 *et seq.*) and ordered plaintiff to award complainant back pay and other relief.

The hearing before the FEPC examiner brought out these facts.

Complainant had been employed by plaintiff's department of public works since 1951. Her job was to clean a certain area of the city hall at night. Prior to 1973, complainant's civil service job title was "janitress." All women employed in the department of public works for cleaning tasks were classified as "janitresses." All men performing cleaning tasks were classified as janitors. Janitors were paid more than "janitresses." On January 1, 1973, these job titles were changed. Janitors were reclassified as custodial workers and "janitresses" as custodial assistants. However, the male custodial workers were still being paid more than the female custodial assistants.

William White, superintendent of custodial workers, testified that in 1970, the department of public works used 25 "janitresses" and 55 janitors in city hall. Of these, 22 "janitresses" and 47 janitors were on the evening shift. All of the "janitresses" and 33 of the janitors cleaned offices. Some of the remaining 14 janitors on the night shift were assigned special jobs such as mopping halls, sweeping corridors and stairways, hauling trash, vacuuming elevators and cleaning public toilets. The rest of the janitors (approximately six) were called "floaters". Floaters were not assigned any particular job. They either filled in for absent workers or did other jobs as assigned. Because of a general absentee rate of 15 percent, floaters usually replaced absent male and female office cleaners. When floaters were not needed to replace absentees, they were organized into a crew to perform cleaning tasks not frequently done, such as stripping and waxing floors. All janitors were paid the same, regardless of their responsibility.

White became supervisor in 1970. Prior to 1970, men and women who cleaned offices also stripped and waxed office floors. When White became supervisor, he ordered the women to stop stripping and waxing the floors. He did not feel women "were suitable for that type of work." Also women were paid less than men. White instituted a separate stripping crew of floaters. They did stripping and waxing in the areas cleaned by both janitors and "janitresses."

White further stated he tried to assign teams of office cleaning janitors and "janitresses" to as many areas as possible so the men could do the heavy work while the women did the lighter work. Again, his reason for this was the janitors were paid more. Office cleaning janitors were supposed to empty wastebaskets and spot mop for "janitresses." These janitors were occasionally required to sweep stairs and shovel snow. These tasks were never assigned to a "janitress." However, White also stated some women worked alone, emptied wastebaskets in their own section and did their own spot mopping.

White's custodial staff was continuously cut after 1970. Accordingly, he was obliged to enlarge individual cleaning areas. In this respect, he also tried to give the men more work by assigning them to larger areas.

However, he stated that at one time, complainant had been transferred to a section formerly cleaned by a man and she was replaced by a man in her old section. Men and women often replaced each other in certain office areas. White also related that in 1973, some women who had cleaned offices in city hall were transferred to the traffic court building to clean offices formerly cleaned by men. The men, in turn, were transferred to city hall to clean the offices formerly cleaned by the women.

White stated that cleaning offices was the first responsibility of the custodial employees and only the more experienced and conscientious janitors were assigned to clean offices.

A number of "janitresses" testified their duties did not differ from those of the janitors who cleaned offices. Complainant and other "janitresses" testified some janitors failed to do tasks done by "janitresses" on a regular basis such as washing furniture, wastebaskets and ashtrays. The office cleaning janitors who testified stated women would do the same job as men cleaning offices. The only exception was the men would empty the wastebaskets for women and help move furniture when the stripping crew was in the area. Also, these janitors would sometimes be required to do other tasks when there was a shortage of manpower and not enough floaters. These tasks consisted of sweeping a flight of stairs, shoveling snow, sweeping a corridor or hauling trash. However, the number of times these janitors were required to do these tasks varied from sweeping a flight of stairs once every two weeks to shoveling snow once or twice in a winter season.

Joan Cole, deputy director of personnel for plaintiff, testified that in 1972 a study was done of the custodial work force to determine whether any changes should be made. The study was undertaken partially because title VII of the Civil Rights Act of 1964 was to become applicable to cities. James Dolan, a personnel analyst for plaintiff's civil service department, did a job evaluation survey and reported on the duties of janitors and "janitresses" in the department of public works. In his report, dated October 12, 1972, Dolan concluded as between janitors and "janitresses," a *"considerable overlap of duties exists' in the area of light [office] cleaning.* Since both job classifications perform these same tasks with about the same frequency *it would indicate that different rates of pay for performance of this work is unjustified."* Dolan warned the classifications of "Janitor" and "Janitress" were inappropriate because they indicated these jobs were assigned on the basis of sex.

Dolan recommended the department of public works change job titles and pay individuals doing light office cleaning at the "janitress" rate and those doing heavy cleaning at the janitor rate, regardless of sex.

Ms. Cole testified, based on this report, the job title of those who did light cleaning was changed to "custodial assistant" and the title of those

who did heavy cleaning was changed to "custodial worker." New job descriptions were developed six months later which "more sharply" defined the light and heavy work classifications. The department prepared tests for the two new positions intending that women could take the custodial worker's examination and men could take the custodial assistant's examination.

Janitors were automatically reclassified as custodial workers and "janitresses" were reclassified as assistants. Cole stated males doing light work could not be reclassified to custodial assistants because they had civil service status in the heavy work title and could not be moved to a title for which they had no standing and had not taken a civil service examination. Also, a "janitress" could not be reclassified as custodial worker since no "janitress" had taken an examination for the heavy cleaning job. Therefore, to take care of the overlap of duties in light cleaning, Cole recommended all custodial workers be given heavier work than the custodial assistants. However, the testimony of the custodial employees indicates none of their job duties changed after their job titles changed.

On these facts, the hearing examiner found a preponderance of the evidence showed plaintiff had violated the Illinois Fair Employment Practices Act (FEPA) by paying complainant a lesser wage than her male co-workers. On September 19, 1977, the FEPC sustained this finding of sex discrimination. It ordered female custodial employees' wages upgraded, awarded complainant the difference between what she made as a "janitress"/custodial assistant and the higher wage paid to janitors/custodial workers commencing as of August 27, 1971 (the date the FEPA was amended to prohibit sex discrimination), plus interest, and also retroactive contributions to complainant's pension and health funds.

During the pendency of administrative review proceedings, a decision was entered in a class action suit in the local United States District Court (*National Organization of Women v. City of Chicago*) in which complainant was a named plaintiff and in which the same facts as were the basis for the FEPC action were alleged. The district court granted plaintiffs there relief under various Federal equal rights statutes. On November 17, 1978, the district court awarded complainant $10,208.55 plus interest of $124.38. On December 7, 1978, the trial court herein affirmed the decision of the FEPC.

On January 5, 1979, plaintiff filed a motion to vacate the order of December 7, 1978. Plaintiff averred that due to the award in the Federal case, *res judicata* applied to bar an award in the instant case. On May 31, 1979, the trial court denied the motion to vacate. The order further stated:

"Susie Bates' [complainant's] counsel represented that any amounts which Susie Bates receives under the order of the FEPC

which covers the same time period as Susie Bates was awarded relief for in a federal case entitled *N.O.W. v. City of Chicago* shall be deducted from such award under said federal case."

Plaintiff contends complainant did not prove her charges of discrimination herein by a preponderance of the evidence, *res judicata* should apply to bar any award in this case, and if complainant's recovery herein is affirmed, she will be allowed a windfall double recovery.

I.

Recently, this court summarized the proper standards for judicial review of decisions of the FEPC (*Board of Education v. Illinois Fair Employment Practices Com.* (1979), 79 Ill. App. 3d 446, 451, 398 N.E.2d 619):

"The Fair Employment Practices Act specifically provides that the agency's 'determination sustaining a complaint shall be based upon a preponderance of the evidence.' (Ill. Rev. Stat. 1977, ch. 48, par. 858.01(c).) We have held that upon judicial review of the administrative decision the circuit court and the reviewing court must examine the record to determine whether the discrimination was proved by a preponderance of the evidence and, whether applying that standard of proof, the agency's decision is against the manifest weight of the evidence. (*Northern Illinois University v. Fair Employment Practices Com.* (1978), 58 Ill. App. 3d 992, 994-96.) As in any judicial review of an administrative decision, the findings and conclusions of the administrative agency on questions of fact 'shall be held to be prima facie true and correct.' (Ill. Rev. Stat. 1977, ch. 110, par. 274.) * * *."

The FEPC official "Guidelines on Discrimination in Employment" provides it is considered a violation of the FEPA "for an employer * * * to differentiate between men and women performing the same or substantially similar work in fixing the wages, benefits and compensation to be made to such employees."

In the instant case, the FEPC determined the evidence "overwhelmingly" established plaintiff's male and female employees perform substantially similar work under substantially the same working conditions. We concur in this conclusion. It is strongly supported by the evidence before us.

A review of the testimony of the male and female custodial employees and of their supervisor, Mr. White, indicates the "janitresses"/custodial assistants performed the same tasks as the male office cleaners. The latter comprised the majority of the janitors/custodial workers employed by plaintiff. The "extra" tasks these male office cleaners may have had to perform such as emptying wastebaskets for

"janitresses", sweeping stairways, moving furniture and shoveling snow, were not so significant or done so frequently and uniformly as to justify a wage disparity.

As for the janitors who were floaters or were on special crews, their different duties were not necessarily heavier tasks and did not justify a higher wage. In fact, plaintiff paid these men at the same rate as the office cleaning janitors. Mr. White stated office cleaners had the greater responsibility, and only the more conscientious and experienced janitors were office cleaners.

Joan Cole testified the civil service laws would not have allowed the department to reclassify "janitresses" as custodial workers in 1973 because they had not taken an examination for the higher paying classification. Job descriptions were altered by plaintiff to effect a sharper delineation of duties in the two custodial positions. But, actual job requirements and performance were properly given more weight than job descriptions by the hearing examiner. (See *Brennan v. Owensboro-Daviess County Hospital* (6th Cir. 1975), 523 F.2d 1013, 1017 (1976), *cert. denied*, 425 U.S. 973, 48 L. Ed. 2d 796, 96 S. Ct. 2170; *Brennan v. Prince William Hospital Corp.* (4th Cir. 1974), 503 F.2d 282, 288, *cert. denied* (1975), 420 U.S. 972, 43 L. Ed. 2d 652, 95 S. Ct. 1392.) The uncontroverted testimony of the custodial employees indicates their duties did not change after they were reclassified.

■■ Plaintiff urges its civil service requirement that employees take an examination for a certain job classification before they could be put in that classification was a "legitimate nondiscriminatory reason" for its employment practices. (See *Board of Education*, 79 Ill. App. 3d 446, 452-53.) We disagree.

As shown above, the FEPC properly concluded the janitors/custodial workers and the "janitresses"/custodial assistants performed substantially similar work. The classification system was therefore based solely on sex and the testing requirement was not a "legitimate nondiscriminatory reason" for plaintiff's employment practices. It is irrelevant that complainant did not take the test for custodial worker. The evidence fully supports the following statement of the FEPC in its decision:

> "Under the Act and the applicable case law, it is a violation for [plaintiff] to maintain two groups, segregated along sexual lines, who perform the same work for disparate wages. The answer is not for females to seek admission to the male classification; it is for [plaintiff] to merge the groups and accord them equal pay."

## II.

Plaintiff's second argument is the defense of *res judicata* should apply

to bar this action. In the Federal case, recently affirmed by the Seventh Circuit Court of Appeals (*N.O.W. v. City of Chicago* (Docket No. 78-2652, Order filed April 29, 1980)), the court affirmed the grant of relief to complainant and other female employees based on the same facts as the instant proceeding. However, relief was predicated upon Federal statutes including title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e (1976)), section 1983 of the Civil Rights Act of 1961 (42 U.S.C. §1983 (1976)) and the Equal Pay Act of 1963 (29 U.S.C. §206(d)(1) (1976)).

Both parties cite numerous Federal authorities on the issue of whether a State employment discrimination proceeding bars a subsequent Federal action. Although one court has barred a claim of discrimination in Federal court that was previously decided in State court (*Sinicropi v. Nassau County* (2d Cir. 1979), 601 F.2d 60, 62, *cert. denied* (1979), 444 U.S. 983, 62 L. Ed. 2d 411, 100 S. Ct. 488), other courts, including the Seventh Circuit Court of Appeals, have held the defense inapplicable to bar such actions. See *Batiste v. Furnco Construction Corp.* (7th Cir. 1974), 503 F.2d 447, *cert. denied* (1975), 420 U.S. 928, 43 L. Ed. 2d 399, 95 S. Ct. 1127; *Gunther v. Iowa State Men's Reformatory* (8th Cir. 1980), 612 F.2d 1079; *Garner v. Giarrusso* (5th Cir. 1978), 571 F.2d 1330; *Cooper v. Philip Morris, Inc.* (6th Cir. 1972), 464 F.2d 9.

In *Batiste*, plaintiff (complainant) received a favorable decision from the FEPC on a race discrimination claim. Meanwhile, plaintiff had brought suit in Federal court under the applicable statutes including title VII. The court held the doctrine of *res judicata* would not bar the Federal suit even though plaintiff had litigated his charges to final adjudication in the State proceedings. The court stated, "There is a strong Congressional policy that plaintiffs not be deprived of their right to resort to the federal courts for adjudication of their federal claims under Title VII." *Batiste*, 503 F.2d 447, 450.

Plaintiff urges the instant case differs from *Batiste* because here, *res judicata* is being asserted in the State court and "[s]ince federal laws preempt this area, the proper court in which to raise res judicata as a defense would be the state, rather than the federal court." We find no merit to this argument.

In *Alexander v. Gardner-Denver Co.* (1974), 415 U.S. 36, 39 L. Ed. 2d 147, 94 S. Ct. 1011, the United States Supreme Court decided a case involving a complainant who had submitted a discrimination claim against his employer to final arbitration under the nondiscrimination clause of a collective bargaining agreement. Complainant was unsuccessful in his arbitration case. Complainant subsequently filed an action in Federal court under title VII. The district court ruled complainant was bound by the arbitral decision and therefore was precluded from suing his employer under title VII. The Supreme Court reversed.

The court reviewed the statutory scheme of title VII in great detail. The court concluded (415 U.S. 36, 47-49, 39 L. Ed. 2d 147, 158, 94 S. Ct. 1011, 1019-20):

"[L]egislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, 42 U.S.C. §2000a et seq., Congress indicated that it considered the policy against discrimination to be of the "highest priority." [Citation.] Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. [Citations.] And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination."

■■ Thus, Federal legislation does not preempt State legislation in the employment discrimination area. It is clear the defense of *res judicata* is inapplicable in this State proceeding as it was in the Federal proceeding in *Batiste* and in *Alexander*.

### III.

Finally, plaintiff contends "if complainant's state court recovery is permitted to stand, she will be allowed a windfall double recovery." This is not necessarily true.

In *Batiste*, the Seventh Circuit Court stated (503 F.2d 447, 450-51):

"This Circuit has noted that where procedures for dual or parallel remedies are provided, duplicative relief must be avoided to the extent that there be no unjust enrichment. [Citation.] Clearly, the federal court action need not be barred in order to prevent duplicative monetary awards, should a plaintiff prevail in both federal and state actions, since the district court is capable of fashioning relief which could preclude an unjust enrichment or windfall."

The Supreme Court also stated in *Alexander*, "judicial relief can be structured to avoid such windfall gains." 415 U.S. 36, 51 n.14, 39 L. Ed. 2d 147, 160 n.14, 94 S. Ct. 1011, 1021 n.14.

State courts are equally capable of fashioning relief to avoid an unjust enrichment or windfall. In the situation before us, complainant has been awarded $10,208.55 plus interest of $124.38 in the Federal case. This

award, of course, is subject to further appeal by plaintiff in the Federal courts. We were informed by the parties during oral argument this award is greater than the amount complainant will ultimately receive herein under the FEPC decision.

In the order denying the motion to vacate, quoted above, complainant's counsel agreed to deduct any amounts which complainant receives under order of the FEPC for the same time period complainant was awarded relief in the Federal case. Apparently, the relief in the Federal court is retroactive to March 1972 while the relief in the FEPC award is retroactive to August 27, 1971, the date the FEPA became applicable to sex discrimination. In computing complainant's award under the FEPC decision, we anticipate all courts will undoubtedly require the parties to follow the guidelines of the order denying the motion to vacate, thus effectively avoiding a double recovery or unjust enrichment.

For these reasons, the order appealed from is affirmed.

Order affirmed.

McGLOON and O'CONNOR, JJ., concur.