CAROL McCULLAR (HOOD), Appellant, v. THE HUMAN RIGHTS COMMISSION et al., Appellees.

Fourth District No. 4—86—0684

Opinion filed August 6, 1987.

Drach & Deffenbaugh, P.C., of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Ann Plunkett-Sheldon, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Decatur, for respondent Board of Education of Community Unit School District No. 108.

JUSTICE KNECHT delivered the opinion of the court:

Petitioner Carol Hood, nee McCullar (Hood), appeals an order of the Illinois Human Rights Commission (Commission), which found Hood was not a victim of employment discrimination on the basis of her sex.

On September 28, 1982, Hood filed with the Commission a charge of sex discrimination in employment on the part of respondent board of education of Minonk-Dana-Rutland Community Unit School District No. 108 (board or District 108). She essentially alleged that from September 1977 until the time she filed the complaint, the board discriminated against her on the basis of her sex by paying her lesser salaries than it paid males for performing substantially equivalent coaching duties. She further alleged she was afforded different terms and conditions of employment than males in that the board afforded different facilities, advantages and privileges to female sports programs as opposed to male sports programs. Hood amended her petition on February 5, 1983, and March 2, 1984.

A hearing on Hood's sex discrimination charges was held on October 8, 1985. At the hearing, Hood testified that from 1971 to 1975 she oversaw all of the District's girls' athletics. She coached girls' high school volleyball from 1978 through 1983, and coached the junior high school girls' volleyball teams from 1979 until the time of the hearing. In the spring of 1981, Hood first became aware that her coaching salaries were grossly disproportionate to those paid males coaching boys' sports. Additionally, the boys' sports had assistant coaches, but the girls' sports had none.

Hood further testified there had been very few instances of a teacher being assigned to coach a sport in District 108 schools in which the participants were of the opposite sex. Hood recalled Judy McNamara coached junior high boys' basketball for two years. No men had coached girls' volleyball at the high school or junior high level.

The parties agreed Hood's salary for coaching girls' high school volleyball never exceeded the head high school football coach's salary and further agreed Hood was not paid as much as the assistant football coach until the 1982-83 school year. They also agreed Hood was never paid as much for her duties as girls' junior high volleyball coach as were the head and assistant boys' junior high basketball coaches.

The evidence adduced at the October 8, 1985, hearing and relied upon by the parties at the proceedings before the Commission relevant to the duties and responsibilities of the positions of girls' high

school volleyball coach and boys' high school football coach, which Hood asserts are comparable for purposes of "determining whether there has been illegal discrimination in pay on the basis of sex," is summarized in the following tables:

TABLE I
GIRLS' HIGH SCHOOL VOLLEYBALL
(Varsity and Junior Varsity Teams)

Number of coaches: 1.

Number of students: 20 to 27 (total for varsity and junior varsity teams).

Length of season: Opening practice begins two weeks before start of school; season lasts until mid-November.

Games per season and duration of games: Varsity—16 regular plus at least two tournaments. Junior Varsity—13 to 15 regular games. Games for both teams last about 1½ hours each.

Practice sessions: Preseason conditioning program—begins approximately August 1, practice sessions are held 1½ to 2½ hours each day for 2 to 2½ weeks.

Preseason practice—begins approximately 2 weeks before start of school. Practice sessions held three hours per day five days per week before start of school (both varsity and junior varsity practice together), and 2 hours and 15 minutes per day five days per week, including Labor Day, after start of school.

Regular season practice—2 hours and 15 minutes three days per week and for unspecified time period on two to three Saturdays.

Miscellaneous duties of coach: Organizing teams, recruiting players, attending end-of-year banquet, making athletic director aware of equipment needs, keeping statistics, obtaining personnel to assist at games, compiling information pertaining to player awards.

TABLE II
HIGH SCHOOL BOYS' FOOTBALL
(Varsity, Junior Varsity, and Freshman Teams)

Number of coaches: 3 (one for each team)

Number of students: 27 to 40.

Length of season: Varsity season usually begins two weeks after start of school; Freshmen season usually begins in mid-October.

Games per season and duration of games: Varsity—9; Junior Var-

sity—8 to 9; Freshmen—5 to 6 (no evidence as to duration of games).

Practice sessions: Varsity—Preseason—3½ hours per day for five full days prior to beginning of school and 2½ hours per day, six days per week after start of school.

 Regular season practice—2 hours, 45 minutes on Tuesdays and Wednesdays; practices of unspecified duration on Mondays and Thursdays.

 Junior Varsity—three practices per week of unspecified duration. Miscellaneous duties of coach: (None specified in testimony.)

## TABLE III
## JUNIOR HIGH GIRLS' VOLLEYBALL
(7th- and 8th-grade teams, also 6th-grade team since 1983)

Number of coaches: 1.

Number of students: 30 to 40 (30 before 6th-grade team added).

Length of season: Regular season begins approximately January 26, ends second week in March followed by a tournament.

Games per season and duration of games: 8th grade—10 to 12 plus tournaments (90 minutes); 7th grade—10 to 12 (90 minutes); 6th grade—4 (60 minutes).

Practice sessions: Beginning January 1—two two-hour practices per week, one practice for 6th- and 7th-grade teams, other for 8th-grade team and two to three separate one-hour practices per week. January 1 through mid-February—2½ hours to six hours on Saturdays, depending on availability of high school gym. Mid-February through end of season—additional weekday after school practice of unspecified duration.

Miscellaneous duties of coach: Recruiting players, ordering knee pads for participants, providing good playing awards, keeping team statistics, training line judges and timers.

## TABLE IV
## JUNIOR HIGH BOYS' BASKETBALL
(7th- and 8th-grade teams)

Number of coaches: 2 (1 for each team).

Number of students: 30 to low 40s.

Length of season: November 1 through February 15

Games per season and duration of games: 8th grade—12 plus 2 tournaments; 7th grade—same. (No evidence as to duration of games.)

Practice sessions: 8th grade—1¼ to 2¼ hours each night throughout season. (No evidence as to practice sessions for 7th-grade team.)

Miscellaneous duties of coach: Obtaining statistics keepers and scorekeepers.

Also at the October 8, 1985, hearing, Judy McNamara testified she coached 7th-grade boys' basketball from 1978 through 1980. When she accepted the position, no 7th-grade basketball coach was employed by the board. When McNamara accepted the position of girls' high school basketball coach, a male replaced her as 7th-grade boys' basketball coach. McNamara also served as assistant junior high and high school track coach from 1979 through 1983. During this period, male and female participants practiced together and also attended track meets together at which they would compete only against members of the same sex. McNamara's primary responsibility was for female track participants, although a Pat Cooper was supposedly employed as the head girls' track coach.

On cross-examination, McNamara acknowledged Cooper, a Mr. Caszalet, and a Mr. Meiss served as head track coaches and to at least some extent shared responsibility for coaching girl track participants. McNamara also admitted she to some extent worked with boys in the track program.

John Marcoline, a District 108 physical education teacher, testified he was head football coach from 1969 through 1972, head baseball coach from 1969 through 1981, and assistant basketball coach from 1969 through 1970. He also served, without additional compensation, as girls' track coach for one year in the mid-1970s, during the first year there was a girls' track team. When the girls' track coach job subsequently became a paid position, another male was appointed to both the girls' and boys' track coach positions.

Marcoline provided much of the testimony concerning the high school football program set out above in Table II. When asked if there are similarities between the coaching responsibilities for football and high school volleyball, Marcoline replied, "I would say they're the same." When asked to elaborate on this statement, Marcoline stated:

"Because the same amount of time put in, same amount of time put in by me. I have seen volleyball coaches put in the same amount of time if not more. I know because having, being under, in a situation we are in now where you have one coach with two teams, you're going to have to spend probably twice as much time. You really should spend twice as much

time if you are going to do the job properly because you have two teams and there is only one coach."

Hood's final witness was John DiMascio, who is employed by District 108 as a 6th-, 7th-, and 8th-grade mathematics teacher. He also coached 8th-grade basketball from the fall of 1974 until the time of the hearing. Additionally, DiMascio coached 6th- through 8th-grade basketball during the 1977-78 school year and was freshman football coach from 1974 through 1979. DiMascio testified Jack Jochums, who is employed by District 108 as athletic director and guidance counselor, at one time coached a girls' bowling team. DiMascio did not know if Jochums received additional pay for this task. The bowling team practiced and had home meets at the Minonk bowling lanes, which Jochums owned at the time. DiMascio provided some of the testimony concerning the high school football program and all of the testimony concerning the junior high school basketball program which is summarized in the above tables.

Following the filing of proposed conclusions of law and award by Hood, a brief by the board, and a reply brief by Hood, the administrative law judge filed a recommended order and decision on May 20, 1986. The judge concluded Hood had not proved a case of sex discrimination in employment. Initially, the judge held Hood could not complain of alleged discriminatory acts which did not occur within 180 days prior to the filing of her initial complaint, since the board was not estopped by its conduct from asserting the bar of the applicable statute of limitations (Ill. Rev. Stat. 1985, ch. 68, par. 7–102(A)(1)), and the "continuing violations" doctrine did not expand the limitations period under the facts of the case.

The administrative law judge's basis for recommending a decision favorable to the board was none of the boys' sports at District 108 schools were comparable with any of the sports which Hood coached. Thus, Hood did not establish she was discriminated against through lack of equal pay for equal work. Nevertheless, the judge urged the Commission to reconsider its prior decisions holding different sports are not comparable for the purpose of establishing a case of sex discrimination on the basis of unequal pay for equivalent work. The judge stated the Commission's position as to this matter necessarily results in disparities in pay based on sex going unchecked, since at smaller schools sports such as football and volleyball are normally available to one sex only.

Following Hood's filing exceptions to the administrative law judge's proposed order, and a memorandum in support thereof, a three-member panel of the Commission affirmed the administrative

law judge's decision in an order entered September 29, 1986. The panel first expressed its approval of the administrative law judge's disposition of Hood's estoppel and continuing violation arguments with respect to the application of the statute of limitations, without stating a separate reason for affirming that portion of the administrative law judge's order.

The Commission further stated it has never intended to foreclose the possibility of coaches being able to prove equal pay violations with respect to the coaching positions for different sports. In holding Hood nevertheless did not establish she was a victim of sex discrimination in employment, the Commission noted the administrative law judge found there was no detailed evidence as to the number of hours devoted by each coach to each sport and stated that because the essence of Hood's claim was she was paid less for doing substantially the same work as a man, she would have had to introduce such evidence in order to prevail. The Commission dismissed Hood's complaint with prejudice.

Hood maintains the Commission took a much too restrictive view of the matter in determining the coaching positions which she asserts are similar to her volleyball coaching positions are not comparable. She asserts the time devoted to jobs is only one of many relevant factors in determining whether they are comparable. She contends the amount of time devoted to District 108 coaching positions is not a significant factor in determining whether the positions are comparable, since coaches are hired to teach specific skills and concepts such as sportsmanship and teamwork to groups of students, and the board has never set time requirements for coaches and did not even imply that compensation was based on the number of hours devoted to coaching.

Hood also notes as high school girls' volleyball coach, she was required to supervise more participants than the male football coaches, and the junior high girls' volleyball coach is responsible for twice as many students as the junior high boys' basketball coaches. She further asserts that even if the amount of time devoted to coaching is the controlling factor, there is adequate evidence she spent the same amount of time coaching high school and junior high girls' volleyball as her male counterparts devoted to coaching high school football and junior high boys' basketball. Finally, Hood maintains the Commission erred in holding the board is not estopped from asserting the applicable statute of limitations.

The Commission argues its decision is not contrary to the manifest weight of the evidence. In support of this contention, the Com-

mission asserts in order to establish a *prima facie* case of sex discrimination, a complainant must prove not only two jobs are substantially equal in skill, effort and responsibility, but her job performance is equal to or substantially the same as that of males holding the jobs which she seeks to compare to her own. The Commission states there is no direct testimony concerning the duties of the District 108 high school varsity football coach during the years 1981 to 1983 by persons who occupied the position during those years, and football is not comparable to volleyball because football involves greater responsibility on the part of the coach to provide protective equipment and otherwise protect the players from injury. The Commission also asserts the evidence establishes Hood had to attend 16 volleyball games per season, while the football coaches had to attend 24 games per season. With respect to the alleged comparability of the junior high girls' volleyball and junior high boys' basketball coaching positions, the Commission observes there is extensive testimony as to Hood's duties as junior high girls' volleyball coach but little evidence as to the duties of the junior high boys' basketball coaches.

The board contends Hood introduced no evidence concerning box office receipts, hours devoted to review of films or coaches meetings, the number of skills taught, the possibility of injury, and the number of participants involved in the sports of volleyball and football. Also, the board notes that there is no evidence concerning the two sports' popularity in the student body and community, coaching peer pressure, competition for coaching positions, conference pressure and tradition. The board asserts Hood contented herself with generalized assertions the coaching of football and girls' high school volleyball are the same, which are premised on the testimony of a witness (Marcoline) who last coached football 13 years before the hearing. The board states much the same is true of Hood's effort to compare the junior high girls' volleyball and junior high boys' basketball coaching positions. The board argues the hours worked are a critical measure of the amount of effort involved in a job and maintains Hood did not introduce sufficient evidence as to this matter.

In her reply argument, Hood states the legal principles pertaining to sex discrimination claims do not require mathematically precise equality in the hours devoted to jobs sought to be compared, especially when pay is not measured on an hourly basis. Hood also argues she should not be required to rebut in her *prima facie* case every possible argument as to why there is a basis for salary disparities between coaching positions, and states the board at no time introduced evidence or arguments which established the position of

football coach involved more pressure than the position of girls' high school volleyball coach or that such pressure was a consideration in determining salary.

Section 2—102 of the Illinois Human Rights Act provides in pertinent part:

"Civil Rights Violations—Employment. It is a civil rights violation:

(A) Employers. For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." (Ill. Rev. Stat. 1985, ch. 68, par. 2—102.)

Section 1—103 of the same Act provides in part:

"(Q) Unlawful Discrimination. 'Unlawful discrimination' means discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, handicap or unfavorable discharge from military service as those terms are defined in this Section." Ill. Rev. Stat. 1985, ch. 68, par. 1—103.

■ In defining illegal employment discrimination and the burden of proof in employment discrimination cases, Illinois courts have placed great reliance on the Civil Rights Act of 1964 (42 U.S.C. sec. 2000e (1982)), the Equal Pay Act of 1963 (29 U.S.C. sec. 206 (1982)), and the case law interpreting this legislation. See *Burnham City Hospital v. Human Rights Com.* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635; *City of Chicago v. Illinois Fair Employment Practices Com.* (1980), 87 Ill. App. 3d 597, 410 N.E.2d 136.

■ ■ Generally, it is illegal for an employer to pay disparate wages or salaries for jobs held by persons of different sexes if the jobs require "equal skill, effort, and responsibility" and are "performed under similar working conditions," unless the disparate pay is attributable to a seniority system, a merit system, or a system which measures earnings by the quantity or quality of production, or represents "a differential based on any factor other than sex." (29 U.S.C. sec. 206(d)(1) (1982); see *Corning Glass Works v. Brennan* (1974), 417 U.S. 188, 41 L. Ed. 2d 1, 94 S. Ct. 2223.) In sex discrimination actions, the burden is on the employee to establish a *prima facie* case of discrimination. Once this is done, the burden shifts to the employer to demonstrate the employment practice at issue is within one of the exceptions to the proscription of unequal pay for equal work by persons of different sexes. (*Corning Glass Works v. Brennan*

(1974), 417 U.S. 188, 41 L. Ed. 2d 1, 94 S. Ct. 2223.) On administrative review, a decision of the Human Rights Commission may not be reversed on the basis of the sufficiency of the proof unless it is contrary to the manifest weight of the evidence. *Burnham City Hospital v. Human Rights Com.* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635; see *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 426 N.E.2d 877.

In its decision, the Commission stated there can be no "violation [of the Human Rights Act] on an equal pay type theory" where it is not clear individuals holding different positions are not even working the same number of hours. The number of hours worked is important and may well relate to the amount of effort involved in a job. In *Hodgson v. Brookhaven General Hospital* (5th Cir. 1970), 436 F.2d 719, 725, a leading case dealing with the definition of equal effort for purposes of the Equal Pay Act, the court stated:

"[J]obs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential."

But see *Equal Employment Opportunity Com. v. Madison Community Unit School District No. 12* (7th Cir. 1987), 818 F.2d 577 (implying equal effort should not necessarily be equated with an equal amount of time spent on comparable jobs).

Unlike the enumerated exceptions to the Equal Pay Act of 1963 (29 U.S.C. sec. 206(d)(1) (1982)), which an employer must prove as affirmative defenses (*Corning Glass Works v. Brennan* (1974), 417 U.S. 188, 41 L. Ed. 2d 1, 94 S. Ct. 2223), an employee must establish as a part of her *prima facie* case that two jobs sought to be compared involve equal skill, effort, and responsibility. Because Hood did not properly establish her volleyball coaching positions involved approximately the same number of hours of work per season as the positions with which she sought to compare them, and thus did not establish the positions involved the same amount of effort, she did not establish a *prima facie* case of sex discrimination in employment.

With respect to the attempted comparison of the high school girls' volleyball and high school football coaching positions, Hood testified the regular high school football season ends the first week in November. However, she waived her right to rely on this testimony as a basis for establishing a *prima facie* case of sex discrimination in employment by failing to mention it in either her proposed conclu-

sions of law and award submitted to the administrative law judge or her exceptions to the administrative law judge's proposed order and supporting memorandum submitted to the Commission.

 On the basis of the pleadings submitted by Hood, the Commission could reasonably have concluded the record contains no definitive evidence concerning the duration of the high school football season. Absent such evidence, there is no basis for concluding that during the relevant time period the high school football coaches were required to devote approximately the same or a lesser amount of time to their coaching duties as Hood was required to devote to her duties as girls' high school volleyball coach. *Ergo*, the Commission's decision is not contrary to the manifest weight of the evidence which was brought to the Commission's attention insofar as it relates to the attempted comparison of the positions of girls' high school volleyball coach and high school football coach.

The evidence relevant to comparison of the positions of girls' junior high volleyball coach and boys' junior high basketball coach is more definite with respect to duration of the playing season for the boys' teams. We cannot, however, say the Commission's finding Hood did not prove those coaching positions involve approximately the same time commitment is contrary to the manifest weight of the evidence. Girls' junior high school volleyball practice begins January 1 and the season ends the second week in March. By contrast, boys' junior high basketball practice begins October 1 and the season ends February 15. The only evidence concerning the number and length of the boys' junior high school basketball practice sessions is the following testimony of John DiMascio:

"Q. Can you tell me what the, how you work your practices for junior high school boys basketball at the eighth grade level?

A. We open practice October 1 is the first legal day of practice and has been the full 12 years.

Q. How many nights a week do you practice prior to the first game?

A. The first game isn't until November 1 and we, that has varied from year to year.

Q. How often do you practice?

A. Okay. We try to practice every night.

Q. For how long?

A. Oh, it ranges from a [*sic*] hour and fifteen minutes to two hours and 15 minutes.

Q. Do you have any practices on Saturdays?

A. Seldom.

Q. And how about on mornings prior to school?

A. No."

On the basis of this rather vague testimony, the Commission and the administrative law judge could reasonably have concluded: (1) Hood presented insufficient evidence as to the number and duration of practice sessions for boys' junior high basketball to provide a basis for comparing the coaching positions for that sport and girls' junior high volleyball; or (2) boys' junior high basketball practice is held every night of the school year during the boys' junior high basketball season, and coaching that sport therefore involves many more hours of work than does coaching girls' junior high volleyball. Either of these conclusions would support the Commission's determination Hood did not establish a *prima facie* case of sex discrimination in pay with respect to her girls' junior high volleyball coach position.

Our review of the record does not convince us the additional duties of the boys' junior high basketball coach—if practice is indeed held every night during the boys' junior high basketball season—were not commensurate with the salary differentials between these positions and the position of girls' junior high volleyball coach. These salary differentials ranged from $50 to $588 per year. If boys' basketball practice is held every night of the season, these differentials are not clearly disproportionate to the extra work entailed by the boys' junior high basketball coaching positions.

The only case cited by Hood pertaining to the equal hours of work issue in the context of coaching salaries is an unpublished United States District Court decision, *Equal Employment Opportunity Com. v. Madison Community Unit School District No. 12* (S.D. Ill. January 9, 1986), General No. 83 5231, *aff'd in part & rev'd in part* (7th Cir. 1987), 818 F.2d 577. There, the court found the female coaches who asserted Equal Pay Act violations spent either more time or approximately the same amount of time at their jobs as did the male holders of comparable but better paying positions. The lack of evidence the coaching positions with which Hood sought to compare her coaching positions required either fewer or approximately the same number of hours of work per season as Hood's positions distinguishes *Madison Community Unit School District* from the case at bar. We note parenthetically that the circuit court of appeals' opinion in *Madison Community Unit School District* holds that in view of wage differentials among coaching positions for different male sports, the district court acted in an arbitrary manner and committed reversible error in determining that the sports of boys' soccer

and girls' basketball, boys' soccer and girls' volleyball and boys' track and girls' basketball are comparable for the purpose of establishing equal pay violations.

In two additional cases cited in support of Hood's position as to this issue, *Coble v. Hot Springs School District No. 6* (8th Cir. 1982), 682 F.2d 721, and *Burkey v. Marshall County Board of Education* (N.D. W. Va. 1981), 513 F. Supp. 1084, the parties apparently did not dispute the coaching positions which were compared required approximately the same number of hours of work per season. None of the remaining cases cited by Hood involved charges by salaried employees of violations of equal pay legislation.

■■ Aside from Hood's failure to establish the coaching positions with which she sought to compare her own required equal effort, the Commission could properly have determined the board established the disparities in the salaries of the coaches of male and female sports are based on a factor other than sex within the meaning of the Equal Pay Act. The evidence establishes that in District 108 schools, male coaches occasionally coached girls' sports and vice versa. There is no evidence of a policy which prohibited or discouraged the coaching of sports by persons of the opposite sex from that of the participants. Thus the pay differentials between the coaching positions for male and· female sports were based not on the sex of the coaches but rather on the sex of the participants. The First District of this court, as well as the courts of other jurisdictions, has held this is a valid basis for a disparity in coaching salaries. 29 U.S.C. 206(d)(1)(iv) (1982); *Erickson v. Board of Education* (1983), 120 Ill. App. 3d 264, 458 N.E.2d 84 (and cases cited therein); *Equal Employment Opportunity Com. v. Madison Community Unit School District* (7th Cir. 1987), 818 F.2d 577.

The Commission's decision that Hood did not establish she was discriminated against on the basis of her sex is not clearly contrary to either the manifest weight of the evidence or the case law pertaining to situations of this type. Our decision renders moot the limitations of actions questions argued by the parties. We affirm the order from which Hood appeals.

Affirmed.

SPITZ, P.J., concurs.

JUSTICE McCULLOUGH, specially concurring:
I agree with the majority except I do not believe that the evi-

dence showed that the pay differentials between the coaching positions for male and female sports were based *not on the sex of the coaches but rather on the sex of the participants*. The burden was on the plaintiff to show similarity of jobs. There is a scarcity of evidence as to what the other sports activities required. As the majority points out, she failed to prove a *prima facie* case.